JOSEPH BARBARO, Respondent, *v.* AUDITORE CONTRACTING COMPANY, INC., and Another, Appellants, Impleaded with NATIONAL STEAM NAVIGATION COMPANY, LTD., and Another, Defendants.

Second Department, February 19, 1926.

Ships and shipping — action by longshoreman against employer and charterer of steamship to recover for injuries suffered when barrel fell on him while stowing cargo — accident was caused by jumping of winch used in loading — winch was part of steamship's equipment — employer not responsible for defect in winch — no implied or actual notice given employer of unsafe condition of winch — charterer whose charter party did not give it control of ship is not liable for unsafe condition of winch.

A longshoreman, an employee of a stevedoring corporation, cannot recover from his employer for injuries suffered when a barrel fell on him while he was stowing a cargo in a ship, in an action predicated upon a claim that the winch, a part of the steamship's equipment, was defective or out of order and because thereof the accident happened, since there is no evidence that the condition of the winch was such as to warn the stevedoring corporation of possible defects, nor is there any evidence of actual notice of any defects in the winch, other than an alleged notice to the stevedoring corporation's foreman, as to which it is doubtful whether the notice was given before or after the accident.

In the absence of notice of defects in the machine, either actual or implied, the stevedoring corporation had the right to assume that the winch was in good condition and safe to use.

The charterer is not liable for the unsafe condition of the winch, for by the terms of the charter party it was not given control of the ship which was retained by the owner through its master and employees, the charter being simply an ordinary time or voyage charter under which the owner retained possession and control of the steamship and its equipment through its own agents.

KELLY, P. J., dissents, with opinion.

APPEAL by the defendants, Auditore Contracting Company, Inc., and another, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of Kings on the 16th day of May, 1923, upon the verdict of a jury for $17,000, and also an appeal by the defendant Auditore Contracting Company, Inc., from an order entered in said clerk's office on the same day, denying said defendant's motion for a new trial made upon the minutes.

*Edward H. Wilson* [*John J. Kean* with him on the brief], for the appellant Auditore Contracting Company, Inc.

*Vernon S. Jones* [*Raymond Parmer* with him on the brief], for the appellant Nicholas A. Galanos.

*Jacquin Frank,* for the respondent.

KAPPER, J.    Defendant Auditore Contracting Company, Inc., a stevedore, in whose employ the plaintiff was as a longshoreman, had a contract with its codefendant N. A. Galanos & Co. to place cargo on board the steamship *King Alexander*, which was owned by the defendant navigation company, and against which last named defendant the action was discontinued at the outset of the trial upon motion or request of plaintiff.  The steamship was equipped with winches, one of them being alongside of hold No. 6. Plaintiff was injured in the course of his work, the accident occurring at about three-forty-five o'clock A. M. on July 8, 1921, while the vessel was lying at the foot of Fifty-eighth street, Brooklyn.  At that time there was being lowered into No. 6 hold with the aid of said winch, a draft consisting of two barrels of oil, which work was being conducted solely by the plaintiff's fellow-servants.  It is the claim of the plaintiff that when the barrels reached some point near the bottom of the hold it became necessary to raise them, in doing which, there came a jerk caused by the winch " jumping," which swung the draft around so that some part of the tackle caught into a metal projection, a part of the ship itself, which loosened the draft, causing the barrels to fall out.  One of them fell on plaintiff and injured him.

Negligence was predicated by plaintiff upon the claim that the winch was defective or " out of order."  No other ground of negligence is claimed.  It is plaintiff's theory that his employer, the Auditore Contracting Company, Inc., had a duty to inspect the winch before using it, and that Galanos & Co., who was the charterer of the ship, was in legal effect the owner and bound to furnish plaintiff with a non-defective winch.

The liability of these two defendants must be approached from different angles.  Under the doctrine of *Liverani* v. *Clark & Son* (231 N. Y. 178), the Auditore Contracting Company, Inc., having undertaken the work of loading cargo on the ship had the right to assume the safety of the winch and that due care had been used by the shipowner to keep and maintain it in reasonably safe condition; that if appearances indicated no danger or defects, an inspection for latent imperfections was not required of the master stevedore; and that in the absence of indications of danger it would be unreasonable .to expect a stevedore minutely to examine this appliance before permitting his employees to use it in their work. (See *Barnevo* v. *Munson S. S. Line*, 239 N. Y. 486, 491.)

As to the liability of Galanos & Co., the learned trial justice charged as a matter of law that " they were in exclusive possession and use of the steamship for their own business purposes, and they became the owners of the vessel as respects all matters per-

taining to the handling, loading and delivery of cargo, and they were responsible for the ship's appliances, including the winch in question used for the purpose of loading the ship. It was the defendant Galanos & Company's duty to see to it, by the exercise of reasonable care and inspection, that the winch and other appliances used for the purpose of loading the ship, were reasonably safe at the time or before the making of the contract with the defendant Auditore Contracting Company." At the close of the charge, counsel for Galanos & Co. noted the following exceptions and request: " Mr. Jones: I except to that portion of your Honor's charge in which your Honor charged the jury that the steamship was at the time of this accident in the exclusive possession and control of the defendant Galanos & Company. Mr. Jones: I except to your Honor's charge in which you charge the jury that at the time of this accident Galanos & Company was responsible for the ship's appliances. I except to that portion of your Honor's charge in which your Honor charged the jury that the defendant Galanos & Company was under a duty to inspect and examine the winch, and to use reasonable care to see to it that it was in proper condition. And I ask your Honor to charge the jury that the duty under this charter party in evidence was on the owner of the ship to maintain and keep the boat, including the winches, in an adequate and safe condition at the time of this accident. The Court: I refuse to charge other than I have charged. Mr. Jones: Exception."

The owner of the vessel being out of the case on plaintiff's own motion made at the outset of the trial, it became necessary, to entitle the plaintiff to recover against Galanos & Co., the charterer, to show that that defendant supplanted the vessel's owner in the matter of responsibility for the condition of the ship and its appliances, and particularly for the winch in question; and to accomplish this result the plaintiff offered in evidence a contract or charter party, made between Galanos & Co. and the shipowner. It will be of importance, therefore, to examine the language of this charter party which I shall shortly do.

The conclusion to which I have come regarding the appeal of the Auditore Contracting Company is that the judgment as to it should be reversed upon the ground that the evidence did not satisfactorily establish that defendant's negligence. There is no pretense that there was anything observable about this winch at or before the beginning of its use (which was less than an hour preceding the accident) that would import danger. The credible testimony is that escaping steam, which was the only thing testified to before the draft gave this so-called jump on raising up the load which was when the accident itself happened, would not cause the

winch to jump or jerk, and that the only way that that phenomenon could occur would be by too much steam going into the cylinder and not from steam that was lost in the air or atmosphere. Nothing worthy of the dignity of a claim of notice to the Auditore Contracting Company arises on this testimony beyond what happened immediately in connection with the accident which was on the raising up of the third draft, before which nothing had occurred. I am satisfied on this record that nothing did occur such as claimed, because the winch was used for a half hour afterwards to complete the loading, and no claim is made of any further jumping manifestation. The claim that the Auditore Company's foreman had been told about the jumping, and requested the gangwayman to keep on working, does not seem to me to be enough proof, when the record is studied, to amount to a charge of notice that there was a latent defect which caused the winch to jump. The record leaves it in doubt whether this notice to the so-called foreman was before or after the accident. The testimony of the gangwayman was that " after Barbaro was hurt " he saw a man with an oil can doing something at the winch for about five minutes, after which everything was all right again. And we have the testimony of the winchman, who, when asked " What was wrong with the winch that made it jerk like that? " replied that, " Well, there was something wrong with the oiling of the winch which causes that." It may be that upon a new trial as against the Auditore Contracting Company the testimony may be more clearly brought out to establish a patent defect, or sufficient notice of a latent defect in the winch, if there were such, as to justify a verdict for plaintiff. But, within the doctrine of the *Liverani* case, so clearly analyzed in the *Barnevo Case* (*supra*), I do not think there was any such condition as should have excited the Auditore Contracting Company's suspicion or to suggest to them defects or dangers, and that an inspection by them for latent imperfections was not required; and furthermore, that in the absence of indications of danger it would be unreasonable to expect a stevedore minutely to examine " this winch " before permitting his employees to work " on it."

As to the appeal of Galanos & Co., we are now required to examine its relation to this ship, and the only evidence of that relation is the charter party.

The question which seems to underlie these charter parties, in so far as it concerns the liability of the shipowner or the charterer where an action for negligence is based upon a defect in one of the ship's appliances, is whether there was a *demise* of the ship or a mere contract for cargo space, either for a specified time or a specified voyage. " The distinction is material." (*Barnevo* v. *Mun-*

*son S. S. Line*, 239 N. Y. 486.)  In the case cited, the plaintiff, a longshoreman in the employ of a stevedore who had a contract with the Munson Line to unload a cargo of sugar at a dock in Brooklyn, was injured while he and his fellow-workmen, under the direction of his employer's foreman, were putting in place a hatch cover which gave way.  Immediately after the accident it appeared that the beams which separated the hatch were insecure because their ends were worn away and splintered.  The vessel had been chartered by the Munson Line from the owner.  Plaintiff's claim against the Munson Line was that it owed him the duty of inspecting the vessel before putting him to work on it, and which duty they negligently omitted to discharge.  (The same claim is made at bar by the plaintiff.)  The trial court in the *Barnevo* case charged that the Munson Line had had the boat in its possession for some time prior to the accident and owed the plaintiff the duty of making an inspection of its condition.  Judge POUND, writing for the court (p. 490), said: " It did not have the boat in its possession.  It was in the possession of the owner and his officers and crew.  The charterer had the cargo on board, but it does not appear that it had, as matter of law, taken charge of the vessel, even for the purpose of unloading.  The court refused to charge that the agreement between the charterer and the owners of the vessel was simply a lease of cargo space; refused to charge that there was not a demise of the ship from the owners to the charterer at the time the accident occurred, and held as matter of law, not, however, with entire consistency, that the vessel was leased by the charterer for the time stated in the charter party.  The charter known as the government form, is not a demise; the officers and crew of the ship are not the officers and crew of the charterer.  The jury should have been so instructed."

The charter party in the *Barnevo* case stated that it was not to be construed as a demise of the steamer; that the owners were to remain responsible for the navigation of the steamer, insurance, crew and all other matters, same as when trading for their own account; and that charterers are to load, stow and trim the cargo at their expense under the supervision of the captain.  Although the charter party there provided that it was not to be construed as a " demise of the steamer," and in the charter party before us there is no such express reservation, this is not material as determining that there was a demise so long as the instrument in its entirety indicates that there was not such a parting of ownership and control by the shipowner to the charterer.  The other clauses construed in the *Barnevo* case are similar to those in the charter party before us.

In the instrument before us we find it provided that the shipowner tenders the ship " for charter complete with the exception of the Master's and crews' quarters, engines, coal bunkers and all other space necessary for the steamer's needs, as well as that space that the charterer would not use to load cargo; " that the steamer is to be used for the charterer's own account for one voyage from New York to specified ports in Europe " for the transportation of passengers and merchandise on and under deck at freights to be agreed upon and collected for the exclusive account of charterer, it being forbidden to charterer to load on the aforesaid steamer other merchandise than that permitted by law and especially inflammable and dangerous articles which the master has a right to refuse and such refusal on the part of the master cannot in any way affect this charter party; " that the shipowner assumed no responsibility for the ability of the steamer " to load a specified quantity of cargo or number of passengers; " that in so far as concerns the loading of cargo and passengers, the charterer is " to abide by the rules and regulations in force at the loading port and imposed by the Insurance Policies and in general to follow in this respect the *instructions and requirements of the master* who is the *only proper party* to regulate questions arising under this clause and especially relating to the anchoring of the ship, the quantity of cargo, its stowage, the number of passengers, the *method of loading*, etc.; " that " All port dues and expenses as well as wharfages, health dues, light dues, towages, pilotages and *all expenses applying to steamer at the loading and discharging ports to be for account of owner* and the dues, taxes, commissions, etc., applying to cargo and passengers to be for account of charterer; " that " All expenses for the operation of the steamer, *for its maintenance, equipment*, bunker coals, insurance premia, victualling and wages of master, officers and crew, engine supplies, etc., to be for account of owner; " that passengers are to be victualled by the " ship's " commissary personnel under the care of the owner " but at the expense of the charterer " at per diem charges specified; that " on arrival at the loading port the master will advise charterer or his representatives of the space available for cargo and passengers; " and that the " owner reserves the right to change the master and effect changes in the personnel of the steamer."

The foregoing are practically all of the material clauses of the charter party to be considered in determining the nature of the instrument. If there is omitted from this *résumé* any other clauses upon which the plaintiff relies, they do not, in my opinion, enlarge the obligations of the charterer nor lessen the implied obligations

of the owner, in so far as concerns the duty of having a safe winch on the ship for the purpose of loading cargo. This duty cannot, in my opinion, be upon both the owner and the charterer. The charterer simply has cargo space for a specified voyage. For that purpose he is given, according to the language of the charter party, a steamship " good, tight, staunch, strong and in every way fitted for the service." If the charter party be a demise of the ship itself, then the ruling of the learned trial justice in charging as a matter of law that the charterer was in possession and control of the ship and its appliances was correct. If, on the other hand, such was not the legal operation of the charter party, then the responsibility for the ship's appliances remained in the owner; and if the charter party left us in doubt as to the responsibility of the owner or the charterer for the condition of the ship's appliances, then the owner must be deemed such, for his rights and authority continue " until displaced by some clear and determinate transfer of them." (*Hagar* v. *Clark*, 78 N. Y. 45, 50.) In the case last cited Judge DANFORTH, writing for a unanimous court, added to my quotation, the following: " The legal presumption is in favor of the continuance of ownership and against any transfer of the ship to the charterer for the voyage, and is said to be so strong that if the end sought to be effected by the charter party can conveniently be accomplished without the transfer of the vessel to the charterers, courts of justice are not inclined to regard the contract as a demise of the ship, although there may be express words of grant in the formal parts of the instrument."

In considering the charter party in the case at bar, so far from finding express words of demise, we cannot even find an implication of such a transfer. The owner reserved space for master and crew and other steamer needs, required the charterer to submit to the captain regarding not alone the quantity of cargo, but also its stowage and " method of loading," and that the owner was to meet the obligation of *maintenance* and *equipment* of the ship. It seems to me that the charterer merely engaged, for a fixed sum, the whole of the cargo space and passenger accommodations of the steamer, and that the charter party was of the character known as an ordinary time or voyage charter under which the owner of the vessel retained possession and control of the steamer and its equipment and operation through his own agents and servants, and that there was no demise of the ship to the charterer, in which event the ship and its equipment, inclusive of the duty to see to their safety, was imposed upon the owner and not transferred *pro hac vice.*

It seems to me that the judgment against Galanos & Co. is

without support in law or in fact, and that it should be reversed and the complaint against that company dismissed.

RICH, JAYCOX and LAZANSKY, JJ., concur; KELLY, P. J., dissents and votes for affirmance.

KELLY, P. J. (dissenting). The plaintiff was injured and the evidence justified the verdict of the jury that the cause of the injury, the fall of the barrels, was caused by the " jumping " of the draft, again traced to the erratic movements of the winch. Was it an unavoidable accident for which no one was responsible or was it caused by negligence? The plaintiff was in no way responsible for the condition of the winch. If it was defective and the defect brought about the injury, against whom has he the right to complain? Even though the accident was caused by the negligence of one of his fellow-servants, if there was concurring negligence of his master, or of the charterer of the vessel, they could not escape liability because the fellow-servant was negligent. It seems to me there was evidence justifying the verdict of the jury that the winch was out of order from the time its operation commenced.

Someone must have been responsible for it. There was evidence by the gangwayman that prior to the accident he called the attention of the foreman of the Auditore Contracting Company to the fact that the winch " jumped," and that the foreman answered him, " All right, I am going after a machinist now." It seems to me the jury was justified in inferring from this evidence that the foreman understood, irrespective of the complaint of the gangwayman that there was something wrong with the winch. He answers: " *All right, I am going* after a machinist *now.*" And the gangwayman says that the foreman said: " Keep on working, you can keep on working. I am going to get a machinist."

. This evidence was not contradicted. The Auditore Contracting Company did not call its foreman to deny evidence of the gangwayman. The respondent says in his points that the foreman was in court. I do not know. He should have been there or his absence explained if there was any question as to the truth of the evidence of the gangwayman. Evidently the jury believed the testimony and I think they were justified in believing it.

I am inclined to the view that someone must be held responsible to these laborers for reasonable care in providing safe machinery for use in their work. In the early hours of the morning, between three and four A. M., despite the natural desire to expedite the work of loading the vessel, these men have the right to look to the performance of the duty of their masters to see to it that they are

given a reasonably safe place to work and reasonably safe machinery and appliances to work with. This plaintiff has been seriously and permanently injured and the jury has decided these issues in his favor. I hesitate to reverse the verdict that this winch was defective and that the Auditore Contracting Company had actual notice of the defect which caused the injury to plaintiff.

As to the charterer, if this charter party was the same as that in *Barnevo* v. *Munson S. S. Line* (239 N. Y. 486), of course the charterer is not liable. But the charter party in that case expressly provided that there was no demise of the vessel. *That* charter was not a demise of the vessel. But it seems to me the charter in the case at bar was more than a mere lease of cargo space. The ship was turned over to the charterer, reserving merely the quarters of the officers and crew. The charterers appear to have been in full control.

In my opinion the judgment should be affirmed.

On the appeal of the Auditore Contracting Co., Inc., judgment and order denying new trial reversed upon the law and the facts, and a new trial granted, with costs to abide the event. On the appeal of defendants Galanos and Louloudis, judgment reversed upon the law, with costs, and complaint dismissed, with costs.