ELIZABETH KUHN, as Administratrix of the Estate of FRANCIS KUHN, Deceased, Appellant and Respondent, v. CITY OF NEW YORK et al., Defendants; P. J. CARLIN CONSTRUCTION COMPANY, Appellant, and ALBEE GODFREY WHALE CREEK COMPANY, INC., Respondent.

Argued March 18, 1937; decided April 27, 1937.

120

Thomas J. Milan, Robert X. Kuzmier, Richard C. Cotter and Jacob Gruber for plaintiff, appellant and respondent. The defendant-appellant was the general contractor and as such owed a duty of safe transportation to the decedent. (DeLee v. Pardy Construction Co., 249 N. Y. 103; Caspersen v. LaSala Bros., 253 N. Y. 491; Haefeli v. Woodrich Engineering Co., 255 N. Y. 442; Hooey v. Airport Constr. Co., 253 N. Y. 486; Rosenberg v. Schwartz, 260 N. Y. 162; Reed v. Davis, 141 Misc. Rep. 36; 232 App. Div. 868; Patrick v. Atlas Knitting Co., 164 App. Div. 753; Matter of Littler v. Fuller Co., 223 N. Y. 369; Maleeny v. Standard Shipbuilding Corp., 237 N. Y. 250; Williams v. Board of Trustees, 204 App. Div. 566; 210 App. Div. 161.) The plaintiff has a common law right of action and may maintain it in the State court. (Engel v. Davenport, 271 U. S. 33; Matter of Heaney v. Carlin Constr. Co., 269 N. Y. 93; La Casse v. Great Lakes Engineering Works, 242 Mich. 454; Maleeny v. Standard Shipbuilding Corp., 237 N. Y. 250; The Hamilton, 207 U. S. 398; Resigno v. Jarka Co., 248 N. Y. 225; Lumber Mut. Cas. Ins. Co. v. Thompson, Inc., 134 Misc. Rep. 370; Warren v. Morse Dry Dock & Repair Co., 235 N. Y. 445; Kursa v. Overseas Shipping Co., 217 App. Div. 775; Danielsen v. Morse Dry Dock & Repair Co., 235 N. Y. 439; Western Fuel Co. v. Garcia,

257 U. S. 233; *Grant-Smith Porter Ship Co.* v. *Rohde*, 257 U. S. 469.) The defendants, appellant and respondent, are chargeable with both constructive and actual notice of the dangerous condition of the boiler. (*Matter of Heaney* v. *Carlin Constr. Co.*, 269 N. Y. 93; *Kirby* v. *Montgomery Bros. & Co.*, 197 N. Y. 27.) Neither in the charge nor in the rulings of the court during the trial was reversible error committed. (*Bank Line* v. *Porter*, 25 Fed. Rep. [2d] 843; *The Abbazia*, 127 Fed. Rep. 495; *Compagnie Maritime Francaise* v. *Meyer*, 248 Fed. Rep. 881; *Van Schaick* v. *United States*, 159 Fed. Rep. 847; *The Archer*, 29 Fed. Rep. [2d] 134; *Gorham Co.* v. *United E. & C. Co.*, 202 N. Y. 342; *Clintsman* v. *Northrop*, 8 Cow. 45; *Ring* v. *Franklin*, 2 Hall, 1; *Lonnberg* v. *Knox*, 123 Misc. Rep. 148; *Egan* v. *Dry Dock*, 12 App. Div. 556; *Caldwell* v. *New Jersey Steamboat Co.*, 47 N. Y. 282; *Swarthout* v. *New Jersey Steamboat Co.*, 48 N. Y. 209; *Miller* v. *International Harvester Co.*, 193 App. Div. 258.) The complaint should not have been dismissed as to the defendant-respondent. (*Webb* v. *Sturtevant Co.*, 157 App. Div. 19; *Campbell* v. *Mc Nulty Brothers*, 162 App. Div. 685; *Bohnhoff* v. *Fischer*, 210 N. Y. 172; *Rausch* v. *Standard Shipbuilding Corp.*, 111 Misc. Rep. 450;, *Matter of Heaney* v. *Carlin Constr. Co.*, 269 N. Y. 93.)

*E. C. Sherwood, Henry Bogert Clark* and *Frederic J. Locker* for defendant-appellant. The action, being in tort and arising out of an accident in navigable waters through the operation of a vessel, is within the admiralty jurisdiction and is governed by the principles of the maritime law of the United States. (*Kellogg & Sons* v. *Hicks*, 285 U. S. 502; *Great Lakes Dredge & Dock Co.* v. *Kierejewski*, 261 U. S. 479; *Robins Dry Dock & Repair Co.* v. *Dahl*, 266 U. S. 449; *Southern Pacific Co.* v. *Jensen*, 244 U. S. 205; *Hoof* v. *Pac. Am. Fisheries*, 279 Fed. Rep. 367; *Danielsen* v. *Morse Dry Dock & Repair Co.*, 235 N. Y. 439; *Thomas* v. *Lane*, 2 Sumn. 1; *Philadelphia Co.* v. *Towboat Co.*, 23 How. 209; *The Plymouth*, 3 Wall. 20; *Kenward* v. *The Admiral Peoples*, 295 U. S. 649;

*Atlantic Transport Co.* v. *Imbrovek*, 234 U. S. 52; *Matter of Heaney* v. *Carlin Constr. Co.*, 269 N. Y. 93; *Int. Stev. Co.* v. *Haverty*, 272 U. S. 50; *Northern Coal & Dock Co.* v. *Strand*, 278 U. S. 142; *Baizley Iron Works* v. *Span*, 281 U. S. 222; *Messel* v. *Foundation Co.*, 274 U. S. 427; *Robins Dry Dock & Repair Co.* v. *Dahl*, 266 U. S. 449; *Gonsalves* v. *Morse Dry Dock Co.*, 266 U. S. 171.) It is a fundamental principle of the maritime law that the sole duty and responsibility in respect of the operation and of the maintenance in seaworthy condition of a vessel rests upon those and those alone who are in possession and control of the vessel. (*Matter of Heaney* v. *Carlin Constr. Co.*, 269 N. Y. 93; *Leary* v. *United States*, 81 U. S. 607; *Reed* v. *United States*, 78 U. S. 591; *United States* v. *Hvoslef*, 237 U. S. 1; *Bramble* v. *Culmer*, 78 Fed. Rep. 497; *The Spokane*, 294 Fed. Rep. 242; 264 U. S. 583; *The Allianca*, 290 Fed. Rep. 450; 294 Fed. Rep. 1020; 264 U. S. 595; *The Volund*, 181 Fed. Rep. 643; *Hagar* v. *Clark*, 78 N. Y. 45; *Barnevo* v. *Munson*, 239 N. Y. 486; *The Beaver*, 219 Fed. Rep. 139; *Luckenbach* v. *Insular Line*, 186 Fed. Rep. 327; *Pacific Imp. Co.* v. *Schubach-Hamilton S. S. Co.*, 214 Fed. Rep. 854; *The Nicaragua*, 71 Fed. Rep. 723; 72 Fed. Rep. 207; *Cosulich Line of Trieste* v. *Bowers*, 49 Fed. Rep. [2d] 218; *The Volund*, 181 Fed. Rep. 643; *Barbaro* v. *Auditore Contracting Co.*, 215 App. Div. 595.) There was no proof of any relationship between the decedent and the defendant-appellant out of which arose any duty to transport him or to exercise vigilance in respect of the operation of the vessel or of the maintenance in seaworthy condition of the vessel, its boiler and machinery, by its duly licensed officers. (*W. Va. C. R. R. Co.* v. *State*, 96 Md. 652, 666; *Palsgraf* v. *L. I. R. R. Co.*, 248 N. Y. 339; *Thomas* v. *Quartermaine*, 18 Q. B. Div. 685; *Robins Dry Dock & Repair Co.* v. *Flint*, 275 U. S. 303; *German Alliance Ins. Co.* v. *Home Water Supply Co.*, 226 U. S. 220; *Nat. Bank* v. *Grand Lodge*, 98 U. S. 123; *Moch Co.* v. *Rensselaer Water Co.*, 247 N. Y. 160; *Iacono* v. *Frank*

*Contracting Co.*, 259 N. Y. 377.) There is no proof upon which the jury could properly base a finding of negligence on the part of the defendant-appellant. (*Barnevo* v. *Munson S. S. Line*, 239 N. Y. 486; *O'Doherty* v. *Postal Telegraph-Cable Co.*, 134 App. Div. 298; *Iacono* v. *Frank Contracting Co.*, 259 N. Y. 377; *The Spokane*, 294 Fed. Rep. 242; *Barbaro* v. *Auditore Contracting Co.*, 215 App. Div. 595.) The testimony of a witness as to a conversation he claimed to have had with the superintendent of the defendant-appellant's construction work on the island was not competent, nor was it sufficient to warrant a finding of notice to the defendant-appellant. (*Bickford* v. *Menier*, 107 N. Y. 490; *Corrigan* v. *Bobbs-Merrill Co.*, 228 N. Y. 58; *Butler* v. *Mich. Mut. Life Ins. Co.*, 184 N. Y. 337; *McCormack* v. *Security Mut. Life Ins. Co.*, 220 N. Y. 447; *Baer* v. *Amer. Credit-Indemnity Co.*, 114 App. Div. 233; 191 N. Y. 540; *Thornton* v. *Hogan*, 82 App. Div. 500; *Huyler* v. *City of New York*, 160 App. Div. 415; *Greiner* v. *City of Syracuse*, 228 App. Div. 566; *Edwards* v. *Dooley*, 120 N. Y. 540; *Dudley* v. *Perkins*, 235 N. Y. 448.)

*William A. Seidl, Patrick S. Mason* and *Paul Koch* for defendant-respondent. The plaintiff, having failed to establish any cause of action against the defendant-respondent, the complaint was properly dismissed as to it. (*De Voe* v. *N. Y. State Rys.*, 218 N. Y. 318; *Meo* v. *Bloomgarden*, 237 App. Div. 325; *Whallon* v. *Sprague El. Elevator Co.*, 1 App. Div. 264; *Famborille* v. *Atlantic, Gulf & Pacific Co.*, 155 App. Div. 833; *Patrick* v. *Atlas Knitting Co.*, 164 App. Div. 753; *Reed* v. *Davis*, 141 Misc. Rep. 36.) Plaintiff failed to plead a cause of action against the defendant-respondent. (*Campoccia* v. *Panama R. R. Co.*, 110 Misc. Rep. 116; *Culhane* v. *Economical Garage, Inc.*, 195 App. Div. 108.) The accident having occurred while decedent was a fare-paying passenger upon a public ferry, plaintiff's rights are exclusively against the owner and operator of the public ferry. (*Atlantic Transport Co.* v. *Imbrovek*, 234

U. S. 52; *The Moses Taylor*, 71 U. S. 411; *The Williamette Valley*, 71 Fed. Rep. 712; *Knickerbocker Ice Co.* v. *Stewart*, 253 U. S. 149.)

RIPPEY, J.   The city of New York owns Rikers Island, on which it has maintained a penal institution for many years.  Having decided to erect new buildings on the island, the city entered into *five* main contracts with as many different contractors for their construction and equipment to be carried through under the supervision of the city architects.  The contract for the general construction work (not including work under contracts for power plants, plumbing, heating, ventilation and refrigerator work and electrical work) was let to the defendant the P. J. Carlin Construction Company (hereinafter referred to as " Carlin "), who agreed to furnish all necessary work and materials to complete its part of the job within 800 days after the work was commenced.  Carlin contracted with the defendant Albee Godfrey Whale Creek Construction Company (hereinafter referred to as " Albee ") to do the iron work which fell within the provisions of the contract between Carlin and the city.  Francis Kuhn, for whose death this action was brought to recover damages, was an employee of Albee.

Rikers Island was inaccessible except by boat.  The city transported prisoners to and from the island by means of a municipally owned ferry, but by the express terms of its contracts with Carlin and with the other main contractors assumed no responsibility for transporting men or materials required in connection with the construction and equipment of the buildings.  Each contractor was required to " investigate the existing means of transportation to and from Rikers Island " and to " assume responsibility for the transportation from mainland to island of men and materials for all work done under this contract."  For a time after work commenced, all men employed on the job under the Carlin contract were transported by the municipal ferry.  Finally the city

notified Carlin that it would no longer furnish ferry service. Thereupon Carlin made the arrangement with one Forsyth, who owned and operated a ferry boat, the steamer *Observation*, to furnish such service, as embodied in a letter dated June 26, 1931, which, so far as material, reads as follows:

" (1) You are to operate the Steamer ' Observation,' which is warranted by you to be officially rated at 250 capacity by local steamboat inspectors, Custom House, N. Y., full crewed, upon a schedule furnished to you by our Field Office, and calling for operation five days in the week only, from Monday to Friday inclusive.

"(2) You are to be compensated therefor by collecting fares from the men at the rate of 10¢ a round trip. In the event that your fares do not reach the sum of $60.00 upon any given day, we shall reimburse you for the difference. Where your fares exceed $60.00 a day, you will pay the excess to us up to a point where we are reimbursed for any monies paid to you by us under this license.

" (3) It is understood that we are in no way obligated to continue your services, which may be suspended or completely shut down at any time at our pleasure. It is understood that you will procure all landing permits except at the Rikers Island landing. This boat will be held for this service for twelve hours a day, and in the event that it becomes disabled, another boat will be immediately substituted of equal capacity, namely, 250, under the Steamboat Inspector's rating.

" (4) We understand that your boat is warranted to be in first class condition, with all necessary permits to operate in this service."

After four or five months it was found that too large a number of men were employed on the island requiring transportation to work to be accommodated on the steamship *Observation*, and arrangements were made by J. Francis Carlin with Forsyth to use other boats in place of the *Observation*. He put into service the *Sea Bird* and the *Albertina* at different times and guaranteed

Forsyth a minimum of $100 a day while those boats were used. The substance of the agreements with Forsyth was that he should furnish ferry service when and as needed for the men and should receive either by collection from the men through fares or, if such collections were insufficient, from Carlin, a minimum of $60 per day for the use of the *Observation* or a minimum of $100 per day for the use of any other ferry. Employees of the other four main contractors also used this same ferry service. On March 22, 1932, Carlin notified all the other main contractors that, because of the fewer number of men which they should be required to employ on the work thereafter, they would not require as large a boat as the one in use and that, in order to utilize the smaller boat which they proposed to put on about March 22, they would be obliged to restrict the passengers to the men working under their own contract, namely No. 1, and it would be necessary for the other contractors on and after that date to provide transportation for their own men.

Employees of both Carlin and Albee were instructed to use the Forsyth service for transportation between the mainland and the island and were forbidden to use any other means of transportation and were given passes by Carlin to identify them and admit them to passage on the boat and to a landing on the island. Each pass issued by the construction company to the men was numbered and dated, with the name, address and signature of the bearer, and countersigned by the company, and it is obvious that it was issued for the purpose of protecting the city of New York and the Carlin Company. A charge of fifty cents was made to cover the cost of the celluloid case in which the pass was carried, of which twenty-five cents was to be refunded when the pass and case were returned. Among other things, there is printed on the pass: " You are cautioned against speaking or communicating in any way with the prisoners. All parcels, luggage and tool boxes subject to

examination. * * * This pass is issued for the exclusive use of the person designated on the obverse side and under the following conditions: It is not transferable. The holder hereof shall not use it for any purpose other than in the lawful performance of his duties with relation to Contract No. 1, Rikers Island Penitentiary and the P. J. Carlin Construction Co. Any marks or erasures made thereon shall immediately cancel this pass and expose the holder to a searching investigation by the officers charged with guarding the Wards and Property of the City of New York. This pass must be immediately returned to the P. J. Carlin Construction Co., when the holder severs his connections Contract No. 1 at Rikers Island, there is no extension or hold-over privilege given or implied for any reason. * * * All passes not immediately returned shall be cancelled. A printed cancellation list shall be issued to the officers and any person unlawfully presenting a cancelled pass shall be liable to arrest and detention until he shall have fully justified himself to the authorities. No pass shall be reissued, bearing a serial number previously issued." A notice was posted on the boat. Its purpose was clearly to notify those using the boat to maintain order and avoid confusion and to save themselves from danger and prosecution for misbehavior on the boat.

On September 9, 1932, Francis Kuhn, with other employees of the Carlin and Albee companies, boarded the steamer *Observation* at her dock at East One Hundred and Thirty-sixth street, New York. The steamer backed out of her berth into the East river. While she was turning to head for Rikers Island, a violent explosion occurred, the ship was destroyed and Kuhn was killed. His administratrix sued both Carlin and Albee for damages arising out of the death of her husband, by virtue of the opportunity offered under the provisions of section 130 of the Decedent Estate Law (Cons. Laws, ch. 13) of the State of New York. The trial court dismissed the complaint as against Albee. The case, as to Carlin, went

to the jury and a verdict for plaintiff resulted. Judgment upon the nonsuit and verdict has been affirmed by the Appellate Division, first department, and appeals by plaintiff and by Carlin, by permission, have been perfected to this court.

We have recently had occasion to consider the status of an employee of defendant Carlin who was injured in the explosion of the *Observation* and have held that the employee could claim and sustain an award against his employer under the Workmen's Compensation Law (Cons. Laws, ch. 67) of the State of New York. (*Matter of Heaney* v. *Carlin Construction Co.*, 269 N. Y. 93; affd., 299 U. S. 41.) In *Matter of Dingfeldt* v. *Albee Godfrey Whale Creek Co.* (272 N. Y. 623) we have made a similar decision against the Albee Godfrey Company where the claimant was its employee. It was there held that the matter of transportation of the men from the mainland to Rikers Island was incidental to and a part of their contracts of employment, that the employment contracts were not maritime but local in character, that the performance of the contract had no direct effect upon navigation or commerce, that neither the ship nor the owner were affected, and that the application of the Workmen's Compensation Law would not work material prejudice to the characteristic features of the general maritime law nor interfere with the proper harmony and uniformity of that law in its international and interstate relations. It was recognized that a different situation would exist if the actions were based on a maritime tort. The Workmen's Compensation Law provides a remedy against an employer for a living claimant or for his dependents in case of the employee's death. (Workmen's Compensation Law, § 33.) Plaintiff's intestate was not the master or a member of the crew of the vessel and jurisdiction of the local courts to apply the remedy is saved. (§§ 24 and 256 of the United States Judicial Code, as amd.; U. S. Code, tit. 28, § 41 [3] and § 371 [3rd].) An action at common law was not available to plaintiff unless

she alleged and established by proof that the Albee Company had failed to secure payment of compensation to Kuhn as provided in the Workmen's Compensation Law. (*Culhane* v. *Economical Garage, Inc.*, 195 App. Div. 108.) This she failed to do, but compliance with the law by Albee affirmatively appeared on the trial and her remedy against Albee under the Workmen's Compensation Law is exclusive. (Workmen's Compensation Law, § 11; *Shanahan* v. *Monarch Engineering Co.*, 219 N. Y. 469.)

As to the liability of the Carlin Company, an entirely different situation arises. The action is not founded on a contract of employment. As pointed out, Kuhn was not an employee of Carlin. There was no contract of employment, express or implied, between Carlin and Kuhn. Recovery is sought against the third party, Carlin, permitted by the Decedent Estate Law on the usual grounds of negligence claimed to be available in such an action. Carlin asserts that jurisdiction lies in admiralty alone and that all substantive rights of plaintiff and obligations of defendant must be determined by the principles and rules of the maritime law. Plaintiff asserts and it has been found, upon the facts, that a defective boiler, a part of the equipment of the steamship *Observation*, rendered the vessel unseaworthy. The explosion of the boiler and destruction of the ship occurred while the vessel was in navigable waters with plaintiff's intestate on board. If liability exists thereby alone, it arose out of a maritime tort, not out of a contract of employment, and the tort was complete within the locality of the injury, thus laying the foundation for jurisdiction in admiralty. (*The Plymouth*, 3 Wall. [U. S.] 20.) Admiralty jurisdiction is not lost because the locality of the injury was in the East river within the boundaries of New York State (*Waring* v. *Clarke*, 5 How. [U. S.] 441), nor because the trip on which the injury occurred was exclusively limited to points of departure, sailing and destination within those boundaries. (*Matter of Garnett*, 141 U. S. 1.) *Because of the location of the*

*accident*, the matter was not of local concern and the substantive *rights and obligations* of the parties arose not out of the local law of New York State, but under the maritime law of the United States (*Robins Dry Dock & Repair Co.* v. *Dahl*, 266 U. S. 449; *Messel* v. *Foundation Co.*, 274 U. S. 427, 429), while any appropriate *remedy* afforded by the common law and the New York State death statute is saved. (U. S. Code, tit. 28, § 41 [3]; Dec. Est. Law, § 130; *Waring* v. *Clarke, supra*; *Chelentis* v. *Luckenbach S. S. Co.*, 247 U. S. 372.) Notwithstanding the State court has concurrent jurisdiction with the Federal courts to entertain the suit (*Messel* v. *Foundation Co., supra*; *Kellogg & Sons, Inc.*, v. *Hicks*, 285 U. S. 502, 514) and the action is brought in the State court, the principles and rules of the substantive maritime law are alone to be applied as ground, if any, for recovery. (*Robins Dry Dock & Repair Co.* v. *Dahl, supra*; *Chelentis* v. *Luckenbach S. S. Co., supra*; *Southern Pac. Co.* v. *Jensen*, 244 U. S. 205.)

We have already called attention to the arrangement for transportation between Carlin and the owner of the vessel. There was no express contract of carriage between the Carlin Company and Kuhn. Kuhn paid for his passage to the owner of the ship. The status of the Carlin Company was not that of a carrier of passengers. The vessel was not transferred to it for any purpose. But even though it were a quasi-charterer of the vessel due to the service rendered, it exercised no supervision or control of the equipment, operation or maintenance of the vessel. Captain Forsyth was originally and continued to be, after the agreement with Carlin, the owner, master and operator of the ship, and he and his own duly licensed and qualified engineer and crew had exclusive charge of it and of its operation. It was not used exclusively to transport employees to and from their work on Rikers Island. It was so used only when men went to work and when they returned from work when the day's work was done. When not on the Carlin schedule, it was used for other ferry service. It was, in fact, a public ferry

engaged only to transport workmen at such times as needed. Miller, one of Carlin's employees, checked men at the dock and (without the knowledge of the Carlin Company) traveled on the boat for one hour each morning while men were being ferried across the river to check the number of men using the boat and to see that all fares were collected, and sometimes collected fares. This was of importance to Carlin, inasmuch as it was liable to Forsyth for any deficiency in the stipulated daily guaranty, but his presence at the dock or on the ferry has no other significance. Within or beyond the terms of the contract between Carlin and the city and the contract between Carlin and Forsyth, the extent of the connection of the Carlin Company with Forsyth in respect of the operation of the boat was to furnish time schedules for trips necessary for the carrying of the men, to give identification passes to and check the men who used the boat for transportation, to see that signs and notices were posted on the boat as an aid to Forsyth in controlling and handling the men and to see that Forsyth received a certain daily stipend from fares or otherwise for such use. Under those conditions, it was not responsible for the boat's inspection, condition, maintenance, operation or navigation. (*The Spokane*, 294 Fed. Rep. 242 [C. C. A. 2d]; certiorari denied, 264 U. S. 583; *The Allianca*, 290 Fed. Rep. 450; affd., 294 Fed. Rep. 1020; certiorari denied, 264 U. S. 595; *Hagar* v. *Clark*, 78 N. Y. 45, 50, 55; *Barnevo* v. *Munson S. S. Line*, 239 N. Y. 486, 490; *Barbaro* v. *Auditore Contracting Co.*, 215 App. Div. 595.)

The record shows that the *Observation* was a steam vessel one hundred and ten feet long with a beam of twenty-two feet, nine and one-half feet deep, with one main deck and a cover deck and with an authorized carrying capacity of 260 persons, and was duly licensed by Federal authorities to navigate the waters of the harbor of New York and its tributaries. Once each year her hull, boiler, machinery and equipment were inspected by employees of the Steamboat Inspection Service of the United States Department of Commerce. Her last

inspection was on April 29, 1932, when she was found to be in a safe condition and seaworthy and a certificate to that effect, effective for one year, was thereupon issued and posted on the boat as required by law. One hundred and fifty pounds was the allowable steam pressure on the boiler. At the time of her last inspection, the boiler was given a complete internal and external examination, its staybolts were examined, and it was subjected to a hydrostatic pressure test of 225 pounds. The records of the Inspection Service in evidence show that the boiler had had five reinspections by five different boiler inspectors between April, 1931, and July, 1932, and no defects were found except one prior to April 29, 1932, which was ordered repaired and presumably this repair was made. At any rate, no defect was reported on the inspection on April 29th. Forsyth was and had been for at least forty years a master and pilot licensed as such, after required examinations, by the Federal government to operate and navigate steam and other vessels. The engineer likewise had the required government certificates. In the contract between Carlin and Forsyth, the latter guaranteed that the vessel was seaworthy and that a full crew would be employed. Carlin had a right to rely upon that guaranty and upon the certificate to that effect provided by the United States authorities who were charged with the duty of inspection and responsibility for the release of the vessel for service unless, in spite of such certificate and guaranty, the boiler was defective and the ship thereby unseaworthy and notice of such defect and unseaworthiness was brought home to the company.

Two days before the accident, Thomas H. Duncan, who had been temporarily employed as a fireman on the boat to take the place of the regular fireman who was absent, had a conversation with James Bell, an employee of Carlin, and the engineer on the boat which he relates, in the main part, as follows: " The Witness: Me and the engineer, and this man Bell were arguing about the boiler. He told me what he knew about it. ' Well, ' I

said, ' come down and look at this ' — The Court: Who is ' he? ' The Witness: Bell. I said, ' Jump down and look at this thing here. Would you be on it? ' And he said, ' Well, we are just trying to run this thing until we get another boat to take its place.' ' Well,' I said, ' it isn't fit to run now.' I said, ' I want to get what is coming to me and get off this thing quick.' And he said, ' Well, stay until old man Forsyth comes back; and we might fix her up a little again and keep her going until we get this other boat.' * * * I showed him the hot water — you know, steam and hot water coming out in the furnace, and on the side of the boiler, and it started running down to the ash can, leaking. * * * I even explained the staybolts to him. * * * I showed him, and tried to explain to him what the stay-bolts were. The staybolt was put in the boiler. * * * A staybolt was made with a thread to hold the entire length of it, and through the middle of that a hole is drilled. If the staybolt is broke in between the two sheets, the steam will come out through this test hole, and that's what I was trying to explain to this man, and I said, ' You know the leg of this boiler is shot; it has been shot for years.' " Duncan quit that night. No direct evidence by any eyewitness was produced as to the cause of the explosion. A lunch room was operated on the boat and gasoline was used for cooking purposes. Whether the explosion occurred because of a leaky boiler was, of course, a matter of inference from expert testimony. But notice to Bell of the defective boiler was not notice to the Carlin Company. The Carlin Company was required by the city to employ one or more *superintendents of construction* with broad general experience in directing men on the various branches of the building work who should have " full authority and shall carry out the directions of the Architect in regard to the removal of rejected material, the employment of sufficient men, the procurement of suitable material, and the method of doing the work, " and should see that subcontractors and their help should do their work in

accordance with the specifications. Conforming with this requirement, the contractor chose Bell as general superintendent of construction. His duties and authority were limited to the building or construction work. Henry V. Carlin had general charge and superintendence for the Carlin Company of everything required in connection with the city contract. Bell had nothing to do at any time with transportation other than to arrange schedules and give instructions concerning the posting of notices. Plaintiff established as part of her case that J. Francis Carlin, an officer of the Carlin Company, had exclusive charge of all arrangements for and supervision over ferry service.

It is well settled that the power to act and bind a principal comes from the acts of the principal and not from his agent. (*Bickford* v. *Menier*, 107 N. Y. 490; *Edwards* v. *Dooley*, 120 N. Y. 540, 551.) The court erroneously charged that knowledge of Bell was knowledge of the Carlin Company and that if the jury found as a fact that the conversation between Duncan and Bell took place defendant Carlin was liable. An exception to the erroneous charge was preserved.

Assuming, without deciding, that the safe place doctrine of the common law has been imported into the general maritime law and that Forsyth stood in the position of a subcontractor of Carlin, it will not aid plaintiff for, even under those conditions, there was no duty on the part of Carlin to make any inspection nor to make repairs of defective means in the exclusive possession and operation and under the control of Forsyth. (*Iacono* v. *Frank & Frank Contracting Co.*, 259 N. Y. 377, 381.)

The judgment of the Appellate Division and that of the Trial Term against P. J. Carlin Construction Company should be reversed and a new trial granted, with costs to abide the event. Otherwise the judgment should be affirmed, with costs.

CRANE, Ch. J., LEHMAN, O'BRIEN, HUBBS, LOUGHRAN and FINCH, JJ., concur.

Judgment accordingly.