935 A.2d 1154

BARBARA BASIL, EXECUTRIX OF THE ESTATE OF JOHN BASIL, AND BARBARA BASIL, INDIVIDUALLY, PLAINTIFF–APPELLANT v. FRANK A. WOLF, DEFENDANT, AND TRANSPORTATION INSURANCE COMPANY, IMPROPERLY PLEADED AS "CNA", DEFENDANT–RESPONDENT.

Argued September 11, 2006—Re-argued May 1, 2007—Decided December 11, 2007.

42

*Lewis Stein,* argued the cause for appellant and cross-respondent (*Nusbaum, Stein, Goldstein, Bronstein & Kron,* attorneys).

*Thomas J. O'Leary,* argued the cause for respondent and cross-appellant (*Connell Foley, attorneys; Mr. O'Leary* and *Karen J. Painter,* on the briefs).

*E. Drew Britcher,* argued the cause for *amicus curiae,* Association of Trial Lawyers of America–New Jersey (*Britcher, Leone & Roth, attorneys; Mr. Britcher* and *Jessica E. Choper,* on the briefs).

PER CURIAM.

Under our workers' compensation system, employers must compensate workers for injuries caused "by [an] accident arising out of and in the course of ... employment, of which the actual or lawfully imputed negligence of the employer is the natural and proximate cause." *N.J.S.A.* 34:15–1. Employers also are obliged to provide care for workers' workplace injuries, including

such medical, surgical and other treatment, and hospital service as shall be necessary to cure and relieve the worker of the effects of the injury and to restore the functions of the injured member or organ where such restoration is possible....

If the employer shall refuse or neglect to comply with the foregoing provisions of this section, the employee may secure such treatment and services as may be necessary and as may come within the terms of this section, and the employer shall be liable to pay therefor....

[*N.J.S.A.* 34:15–15.]

In this appeal, an employer satisfied both obligations through its workers' compensation carrier. It is the quality of the medical care that was provided to one of the employer's injured workers that has prompted this negligence action against the employer's compensation carrier.

Specifically, this appeal is taken from the dismissal of all claims filed in a common law action by the Estate of John Basil (Estate) against Transportation Insurance Company (TIC), the compensation carrier of decedent's employer. John Basil (Basil) had been injured in a workplace injury in 1996. In 2000, he died from a

Stage IV sarcoma that the Estate claims could have, and should have, been identified and investigated when Basil was evaluated for purposes of insurer-authorized treatment for an exacerbation of pain from his earlier workplace injury.

The Estate sued TIC for the alleged medical malpractice of the physician who performed the independent medical examination for TIC as part of its pre-approval of Basil's treatment. The Estate also sued the physician. The Estate's claims against TIC were based on various vicarious liability theories, including retention of control and negligent hiring of an incompetent contractor. In addition, the Estate filed a direct action against TIC, claiming that its pre-approval regimen amounted to the direct provision of medical care, which was negligently delivered to Basil. The trial court granted the insurer's motions for summary judgment and the Appellate Division affirmed. We initially granted only plaintiff's petition for certification, *Basil v. Wolf*, 185 *N.J.* 596, 889 *A.*2d 443 (2005). After oral argument, we granted the defendant insurer's protective cross-petition and ordered re-argument. 190 *N.J.* 253, 919 *A.*2d 847 (2007). We now affirm.

I.

Our factual statement is based on the summary judgment record in this matter. Therefore, we view the facts in the light most favorable to plaintiff, the non-moving party. *R.* 4:46–2; *Brill v. Guardian Life Ins. Co. of Am.*, 142 *N.J.* 520, 540, 666 *A.*2d 146 (1995). Our recitation focuses on the facts relating to Basil's interactions with the allegedly negligent physician and TIC.

Basil was the Branch Manager at Jasper Engines and Transmission Company (Jasper), in Fairfield, New Jersey, when he suffered a compensable workplace injury on September 27, 1996. At the time of the injury, he experienced pulling in the anterior, inferior and medial right rib cage close to the sternum. About a week later he felt a "ball or knot" in the area, which caused sharp pain when sitting in certain positions even for short periods.

On the day of the injury, Basil went to his chiropractor, Dr. Brett Coryell, who administered standard manipulation for Basil's injuries to his rib cage. Basil saw Dr. Coryell five additional times until he was discharged on November 19, 1996, having improved to the point of experiencing only "sporadic episodes" of pain. Although Jasper's workers' compensation insurer did not authorize the chiropractic visits, it paid for them.

More than a year after the accident, on December 1, 1997, Basil experienced an exacerbation of the pain without any new injury to the area. He asked TIC for approval to resume chiropractic treatment at the insurer's expense. TIC refused to approve additional chiropractic treatment, but offered to have Basil examined by an orthopedist. While Basil resumed the chiropractic treatment nonetheless at his own expense, one of TIC's claims representatives, Pamela Hudson, referred him to Dr. Frank A. Wolf, a New Jersey-licensed physician, for evaluation.

Dr. Wolf operated an orthopedic surgery practice in Phillipsburg, New Jersey from 1968 until late 1992/early 1993, when he closed his practice and terminated his attending privileges at Warren Hospital. Because he no longer planned to treat patients, he also terminated his medical liability insurance at about the same time. He kept his Phillipsburg office, however, and began to perform independent medical evaluations (IMEs),[1] on a part-time basis, for insurance companies and attorneys.

---

[1] An "independent medical examination" or "IME" is, generally stated, a medical evaluation performed by a physician or other health care professional engaged by the person or entity against whom or which the patient has a claim, be it either for payment of medical expenses or for damages arising out of the patient's medical condition. That health care professional then reports his or her findings and conclusions to the entity that engaged him. *See, e.g., In re Camden County,* 170 *N.J.* 439, 444, 790 A.2d 158 (2002) (describing remand in Public Employees Retirement System application to consider independent medical examination of applicant pursuant to *N.J.A.C.* 17:1–4.37(c)); *In re Farrell,* 108 *N.J.* 335, 356, 529 A.2d 404 (1987) (establishing, as part of procedure for patient who requests discontinuance of life-sustaining medical treatment, an IME by "two non-attending physicians ... to confirm that [the patient] is competent and is fully informed about his or her prognosis, the medical alterna-

Hudson sent Dr. Wolf a standard referral letter, which asked Dr. Wolf "to examine John Basil for evaluation purposes only," and explained that "[t]he purpose of this examination is to determine whether John Basil has sustained any permanent disability as a result of [the 9/27/96] injury." The letter asked Dr. Wolf to obtain "a detailed medical and work history and [to] comment on causal relationship, diagnosis, and need for additional treatment."

Dr. Wolf saw Basil on January 20, 1998. His examination notes indicated that Basil "prefer[red] chiropractic treatment due to established and positive relationship," and Dr. Wolf concluded that Basil should continue to see a chiropractor or physical therapist if he wished. In his January 20, 1998, report to the insurer, Dr. Wolf stated that

[t]he examination include[d] a review of all medical information provided, a history, physical examination, review of studies and or reports and an opinion as to diagnosis(es) with summary. This evaluation, as the patient has been advised, does not establish nor imply a patient-physician relationship.

. . . .

[Basil] believes that at present he is again at a point where occasional ibuprofen is all that may be required but also feels that, based on the recent experience, exacerbations requiring greater or "in depth" treatment cannot be excluded. [H]e . . . is unable to blow his nose without using a hand to splint the right costal cage.

. . . .

Back and chest evaluation reveals that the right inferior coastal margin and intercostal muscle areas overlying the lowermost three to four ribs are moderately tender and *there is an area of fullness in the area between the lower rib cage and sternum.* Posteriorly there is some muscle tenderness along the lateral margin of the latissimus dorsi. . . .

There are no x-rays, special studies nor reports of same [made available for my review].

The diagnoses are: – probable hematoma resulting from stretching and tearing mechanism of injury involving abdominal muscle, (such as rectus abdominus) and fascial attachments to the right inferior costal cage—healing with normal fibrous tissue or scar. The area remains tender and therefore symptomatic. . . .

There is a causal relationship, assuming the accuracy of the history relevant to the right rib cage injury and there does appear to be a causal relation based on the

tives available, the risks involved, and the likely outcome if medical treatment is disconnected").

chronology only relevant to the right middle trigger finger. Both problem areas should benefit from additional treatment in the form of physical therapy.

My standard procedure is to provide a physical therapist (RPT) or physical therapy facility with the diagnoses, a general recommendation and request their recommendation or the specific treatment plan and modalities, followed by approval or modification of that plan.... A follow up visit at approximately three months would be appropriate. Enclosed is a prescription for that purpose.

[(Emphasis added).]

That reference to an "area of fullness" that Dr. Wolf identified during the January 20, 1998, examination of Basil's right lower rib cage is the focal point of the Estate's malpractice claim. It claims that Dr. Wolf negligently failed to investigate and diagnose, or to refer for investigation and diagnosis, the "fullness" that more than a year later was identified to be an ultimately fatal spindle cell sarcoma.

When deposed about that January 20 examination, Dr. Wolf was asked whether there were any other diagnoses he had considered at the time. He indicated the possibility of a hernia or "[a] possible tumor," but did not specify any particular type of tumor that he had considered as a potential diagnosis. He explained that he did not believe there was a need to examine the swelling further at the time because of its intermittent nature.

During the January 20, 1998, exam, Dr. Wolf suggested to Basil that he discuss with the insurer finding his own physician to evaluate and treat him because Wolf thought it was "foolish" for Basil, who lived in Pennsylvania, to travel forty-five minutes to receive treatment in the Phillipsburg area. Dr. Wolf envisioned that Basil would "establish himself with [a treating physician,]" and work with a physical therapist to alleviate his discomfort, and that the physical therapist would consult with Dr. Wolf regarding specific treatment for which authorization would be requested. Dr. Wolf also believed that the three-month follow-up visit, to which he referred in his January 20 letter, would occur with "a treating physician of [Basil's] own arrangement."

Ms. Hudson telephoned Dr. Wolf about the examination two days later. Dr. Wolf informed her that he had recommended

physical therapy but that he also had told Basil that seeing his chiropractor, Dr. Coryell, would not hurt his condition. Hudson and Dr. Wolf spoke again on January 27. Hudson asked that he submit a report and that he provide a prescription authorizing Basil's physical therapy. The same day, Hudson scheduled Basil for a physical therapy session to occur on January 29, 1998. Dr. Wolf sent the prescription to the insurer, but did not forward a copy to Basil.

On February 3, 1998, Hudson entered a note in Basil's claim file memorializing that she had, that day, sent a "letter to Dr. Wolf authorizing any necessary takeover treatment." Her entry explains that "Dr. Wolf requested same due to his giving of [prescription] and [because his independent medical exam authorization] only instruct[ed him] to evaluate and comment." Hudson's February 3 letter to Wolf was a standard form letter used to authorize a physician to give or prescribe treatment. The letter therefore confusingly stated that the "claimant has been referred to your office for *treatment* for injuries sustained as a result of a work related injury"; requested medical reports on claimant's progress and expected course of treatment; and noted that "prior authorization for any special services," including diagnostic tests "*must* be obtained [from insurer] . . . . and arranged with another . . . network provider." Dr. Wolf never responded to the February 3, 1998, letter.

On February 13, 1998, Hudson noted that Basil

never started [physical therapy], on date of appointment 1/29/98 provider stated they never [received prescription] from [Dr. Wolf] therefore they refused to treat. [Basil] has an appointment now for Monday 2/16/98 but he doesn't want to go before he has an MRI [2] or x[-]ray to rule out a tear in the muscle. He feels a lump in his rib area and he wants it looked at before [h]e tears, pulls or disrupts something.

---

2 A "MRI," or "magnetic resonance imaging," is "a noninvasive diagnostic technique that produces computerized images of internal body tissues and is based on nuclear magnetic resonance of atoms within the body induced by the application of radio waves." *Merriam–Webster's Medical Dictionary* 424 (2006).

Hudson also requested that the claim be reviewed by a supervisor. Basil's claim was reassigned to Claim Representative Crecco, and the insurer's records do not reveal any additional action on Basil's file between February 23 and May 6, 1998.

In the interim, Basil retained Ronald Bronstein, Esq., who wrote to Hudson on April 7, 1998, urging that the insurer "permit active medical treatment" of Basil. On May 6, 1998, Crecco informed Bronstein that Basil had not attended the physical therapy session that had been prescribed by Dr. Wolf and scheduled by Hudson. Bronstein asked for a reevaluation and a new physical therapy prescription for Basil. Accordingly, Crecco scheduled a "reevaluation" or "follow-up independent medical exam" with Dr. Wolf for May 26, 1998.

Upon conducting that May 1998 re-examination, Dr. Wolf wrote to the insurer that

> [t]his patient has chosen to and wishes to continue with treatment in proximity to his home geographic area and; therefore, has been advised that this examination does not establish nor imply a patient-physician relationship.[3]
>
> . . . .
>
> Apparently, there was a delay in the receipt and implementing of a prescription-treatment plan for physical therapy as outlined in the 1–20–98 report and in a preliminary discussion with the therapist chosen by the patient the question of necessity for x-rays and or MRI of the right costo-chondral inferior area was raised. The uncertainty apparently resulted in no actual course of physical therapy and very little else happening well into February 1998. Pain in this anatomic area continued, the area "jumped" when touched and Mr. Basil returned to the chiropractor for a series of treatments. He was also finding that if he sneezed he had to hold his right lower rib cage to prevent pain. [T]here was one episode of such severity that he contorted himself to the right and triggered an episode of left sided "sciatica" so painful that he slept on the floor. The chiropractor after 8 to 10 visits during which he manipulated or "cracked the back" an[ ] [sic] 85% improvement. Various areas "feel black and blue" with the right inferior costal area, the mid dorsal area just below the scapula are tender and an area just to the right of the navel is also tender and sensitive "like sunburn". In general the discomforts are located between this area of the navel and the dorsal area of the back as described. Further the right lower rib area feels "like a golf ball" rolling and tingling. Sitting . . . [is] extremely bothersome.

---

3 In his deposition, Dr. Wolf stated that he would not have undertaken Basil's treatment even if Basil had not chosen to continue treatment nearer to his home.

... There is at least an annoying pain level at all times in the areas described.

... [The] problems ... appear to have increased in severity....

... The right inferior costal margin and intercostal muscle areas overlying the lowermost three to four ribs are somewhat more tender and the area of fullness in the area between the lower rib cage and sternum persists along with some muscle tenderness along the lateral margin of the latissimus dorsi and just below the right scapula. There is a paresthesia in the area to the right of the umbilicus....

There are no x-rays, special studies nor reports of same.

The diagnoses remain: probable hematoma resulting from stretching and tearing mechanism of injury involving abdominal muscle, (such as rectus abdominus) and fascial attachments to the right inferior costal cage-healing with normal fibrous tissue or scar. Due to some changes in the findings, as described, it is necessary to rule out an intercostal neuralgia on the right or even central nervous system pathology though the latter is not likely.

. . . .

At this point further study ought to be completed for confirmation or modification of diagnosis. Mr. Basil wishes to pursue any such plan as close to home as possible. *A simple chest and rib x-ray series would be the logical first step and if necessary an MRI.* If there is concurrence with the diagnosis of a neuralgia then a trial of steroid sono-phoresis in the area of complaint and administered by a physical therapist or depository steroid infiltration might be considered.

[(Emphasis added).]

By his statement that "very little else [was] happening," Dr. Wolf explained that he meant that

[Basil] didn't go to any of the things that I suggested. He didn't seek either a physician in the area, at least as to the history that he gave me, nor did he, through the physician or directly himself, seek a therapist for a consultation.

Dr. Wolf's notes from that exam memorialized that Basil could not sit up from lying on his back without help—which Dr. Wolf believed was significant—and that the "patient needs studies, x-rays, possible MRI to follow." In his deposition, Dr. Wolf recalled that although he did not formally recommend x-rays in his report on the January 20, 1998, exam, he did discuss x-rays with Mr. Basil. Dr. Wolf said that he explained to Basil that if "[Basil] chose a physician, an MD, as compared to a chiropractor, that in all likelihood x-rays would be ordered and possibly other studies." Dr. Wolf did not feel that it was necessary for him to advise the insurer that x-rays, specifically, were recommended because Dr. Wolf "thought [Basil] was going to discuss that with [the insurer]"

or that, once Basil chose a treating physician, "that physician would make that judgment."

The insurer received Dr. Wolf's report on June 1, 1998, and took no further action until September 11, 1998. Bronstein, Basil's lawyer, had written during August to ask the insurer to authorize further treatment or the diagnostic tests discussed in Dr. Wolf's report. On September 11, 1998, Crecco sent Dr. Wolf's report to Bronstein and advised him that the insurer "will allow *treatment* [consisting of 'a simple chest and rib x[-]ray, which is a good starting point'] recommended by our doctor [Wolf,]" and that if Basil "wishes to *continue treatment* we can arrange for take over treatment by a provider in his area." [4] (Emphasis added). Accordingly, Bronstein requested an x-ray and was told by the insurer that he could make arrangements for that near to Basil's home. On October 6, 1998, Crecco wrote to Dr. Wolf "request[ing] ... a prescription [for Basil] to obtain a simple chest and x-ray series[,]" and to inform Basil to have the results sent to Dr. Wolf so that he could provide the insurer with an update. Dr. Wolf telephoned in the prescription to Pocono General Hospital (Pocono) on October 20, 1998, authorizing performance of a "chest and right thoracic wall standard [x-ray]."

Pocono was paid for the x-ray in November 1998, but Dr. Wolf's records do not specify when the x-ray was performed. A Pocono technician reported orally to Dr. Wolf that the x-ray results were negative and that an MRI of the "right lower chest wall"—as Dr.

---

[4] In the interim, on July 6, 1998, Basil was examined by Dr. Arthur Tiger, an orthopedist, who provided a percentage estimate of Basil's disability from the September 27, 1996, workplace injury for purposes of the compensation disability claim. Dr. Tiger's report documented Basil's complaint of "constant pain and discomfort in and about the right lower rib cage which now tends to radiate around to the back," and states further that

[e]xamination of the abdomen reveals a significant amount of point tenderness over the upper rectus abdominal muscles where it inserts into the right lower rib cage. The entire right lower rib cage is sore, tender and uncomfortable from the area of the lower sternum to the mid axillary line on the right.

Wolf had anticipated—was recommended. Dr. Wolf stated that he made a "mental note" of that conversation, but his files contain no record that he contacted the insurer or Basil to relay that information until Crecco contacted him sometime in late February 1999 to inquire about the update to his report.[5]

Dr. Wolf responded by letter dated February 26, 1999 that stated:

Th[e chest and right thoracic wall standard radiographic] study was reported as negative but in the report, as we anticipated in our note requesting the study, a recommendation was made for an MRI of the right lower chest wall. . . .

Mr. Basil has been pursuing further follow up of his problem, stating that he continues to be in considerable pain. My recommendation is that approval of the MRI be considered. There are a number of diagnostic possibilities; such as hematoma, *other tumor or muscle hernia*, that may remain undetectable on physical examination or even standard tests, particularly in view of the intermitting nature of the area of swelling. I also recommend that he be referred to a thoraco-abdominal surgeon for further assessment and treatment of *this nebulous mass.*

[(Emphasis added).]

Dr. Wolf also sent a copy of that letter directly to Basil.[6]

By his reference to "other tumor," Dr. Wolf testified that he meant "any other condition that could create a swelling," and by "mass," he was referring to "the swelling on the right intercostal and lower costal margin." He maintained that he did not consider such "other tumor" the most likely diagnosis because the area of swelling fluctuated, there was no progression of the swelling, and Basil was not experiencing loss of appetite, weight loss, or temperature changes. Rather, as of February 26, 1999, Dr. Wolf thought

---

[5] According to Crecco, she had no idea "why it took [Dr. Wolf] five months to answer [her October 6, 1998, letter asking Dr. Wolf to report back to her about the Pocono x-ray]." Throughout that time she did not contact Dr. Wolf because she had been out sick with pneumonia during October, November, and December of 1998.

[6] Before Dr. Wolf wrote the February 26, 1999, letter, Basil had called and informed Dr. Wolf that he was seeing a physician. Dr. Wolf told him that that was what Basil should be doing and reiterated that an MRI, and possibly other studies, might be necessary. Dr. Wolf believed "that [Basil] understood that [Dr. Wolf] was not his treating physician."

that a "muscle hernia" diagnosis, confirmable by MRI, was most likely. Dr. Wolf's contact with the insurer and Basil effectively ended with the sending of his February 26, 1999 report.

Basil was the only patient Dr. Wolf recalled ever examining for TIC. He closed his office and ceased doing IMEs in the months prior to December 2001. Indeed, he did not learn whether a follow-up MRI was performed on Basil. The insurer's payments to Dr. Wolf totaled $750, consisting of payment for two IMEs. According to Crecco, "Dr. Wolf never treated Basil." Rather, between February 1998, and February 1999, Dr. Wolf served only as the insurer's "independent medical examining doctor."

Those facts culminate in Basil's tragic death. During a September 13, 1999, follow-up visit to the thoraco-abdominal surgeon that Basil had seen on referral by TIC concerning a previously identified hernia, the surgeon, Dr. Chevinsky, confirmed "a lump in the area of [Basil's] right flank and chest wall." Dr. Chevinsky recommended that the area be imaged. On October 26, 1999, a needle biopsy was performed. It disclosed "a huge retroperitoneal [spindle cell] tumor[, probably sarcoma] in [Basil's] right flank involving the abdominal wall." Basil died of a stage IV sarcoma on September 17, 2000, at the age of 56.

Over a year and a half prior to the diagnosis of Basil's spindle cell tumor, Basil had filed a workers' compensation claim in the Mt. Arlington Division of Workers' Compensation and received a lump sum payment of $19,975 pursuant to *N.J.S.A.* 34:15–20 for his work-related disabling injury. After his death, Mrs. Basil filed the instant action.

## II.

The workers' compensation system represents the bargain that was struck between employers and employees concerning workplace injuries, whereby employers shoulder the expense of workers' injuries arising out of the performance of work duties. *Ricciardi v. Damar Prods. Co.*, 45 *N.J.* 54, 60, 211 *A.*2d 347

(1965); *Morris v. Hermann Forwarding Co.*, 18 *N.J.* 195, 197–98, 113 *A.*2d 513 (1955). The Act

> involved a historic trade-off whereby employees relinquished their right to pursue common-law remedies in exchange for automatic entitlement to certain, but reduced, benefits whenever they suffered injuries by accident arising out of and in the course of employment. Thus, the *quid pro quo* anticipated by the Act was that employees would receive assurance of relatively swift and certain compensation payments, but would relinquish their rights to pursue a potentially larger recovery in a common-law action.
>
> [*Millison v. E.I. du Pont de Nemours & Co.*, 101 *N.J.* 161, 174, 501 *A.*2d 505 (1985).]

*See also Lindquist v. City of Jersey City Fire Dep't.*, 175 *N.J.* 244, 257, 814 *A.*2d 1069 (2003) ("This concept is sometimes referred to as the social compromise theory because of both the gain and the loss experienced by employees and employers alike."). As for the employers part of the bargain,

> [b]ly accepting the benefits of the act, the employer assumes an absolute liability. He gains immunity from common-law suit, even though he be negligent, and is left with a limited and determined liability in all cases of work-connected injury. [*Dudley v. Victor Lynn Lines, Inc.*, 32 *N.J.* 479, 489, 161 *A.*2d 479 (1960).]

Thus, the workers' compensation remedy is, in essence, an agreement between employer and employee, *N.J.S.A.* 34:15–7, which renders the workers' compensation remedy an exclusive one. As *N.J.S.A.* 34:15–8 explains,

> [s]uch agreement [under Section 7] shall be a surrender by the parties thereto of their rights to any other method, form or amount of compensation or determination thereof than as provided in this article and an acceptance of all the provisions of this article, and shall bind the employee and for compensation for the employee's death shall bind the employee's personal representatives, surviving spouse and next of kin, as well as the employer, and those conducting the employer's business during bankruptcy or insolvency.
>
> If an injury or death is compensable under this article, a person shall not be liable to anyone at common law or otherwise on account of such injury or death for any act or omission occurring while such person was in the same employ as the person injured or killed, except for intentional wrong.

*See also N.J.S.A.* 34:15–49 (Division of Workers' Compensation vested with exclusive jurisdiction over claims under Chapter).[7]

---

[7] The Act's exclusivity bar also applies to injury caused by the actions of a fellow employee. *Barone v. Harra*, 77 *N.J.* 276, 390 *A.*2d 571 (1978) ("[The Act]

 It is well settled in this State that there is no direct action available to an injured employee against the employer, or against the employer's insurer when the insurer takes no action beyond that which is required under the Act and the carrier's insurance policy. For decades the courts of this State have recognized that an employee's exclusive remedy is to pursue a claim within the Division of Workers' Compensation (Division). *See, e.g., Cortes v. Interboro Mut. Indem. Ins. Co.*, 232 *N.J.Super.* 519, 523–24, 557 *A.*2d 1019 (App.Div.1988), *aff'd o.b.*, 115 *N.J.* 190, 557 *A.*2d 1001 (1989) and cases discussed therein. Furthermore, even when an employer, acting through its insurer, does not furnish necessary medical treatment when requested to do so by an employee, the exclusive remedy for the employee is to pursue a claim in the Division. *See Univ. of Mass. Mem'l Med. Ctr., Inc. v. Christodoulou*, 180 *N.J.* 334, 345, 851 *A.*2d 636 (2004). Exceptions to the no-direct-action rule are few and narrow. An action at law has been permitted against a workers' compensation carrier when the carrier has performed services that go beyond providing workers' compensation coverage to an employer. *Compare Hinojo v. N.J. Mfrs. Ins. Co.*, 353 *N.J.Super.* 261, 270, 802 *A.*2d 551 (App.Div.) (allowing claim), *certif. denied*, 175 *N.J.* 76, 812 *A.*2d 1109 (2002), *and Mager v. United Hosps. of Newark*, 88 *N.J.Super.* 421, 426–28, 212 *A.*2d 664 (App.Div.1965) (allowing claim), *aff'd o.b.*, 46 *N.J.* 398, 217 *A.*2d 325 (1966), *with Rothfuss v. Bakers Mut. Ins. Co.*, 107 *N.J.Super.* 189, 193, 257 *A.*2d 733 (App.Div. 1969) (dismissing claim that insurer failed "to furnish prompt and adequate medical care"). That said, parties outside of the employment relationship gain no benefit from the exclusive nature of the compensation scheme's remedy. *N.J.S.A.* 34:15–40 states that

[w]here a third person is liable to the employee or his dependents for an injury or death, the existence of a right of compensation from the employer or insurance carrier under this statute shall not operate as a bar to the action of the employee or his dependents, nor be regarded as establishing a measure of damage therein.

---

precludes tort actions against fellow employees for compensable actions occurring while both persons are in the same employ, except for intentional wrongs.").

The workers' compensation remedy does not supplant a plaintiff's common-law remedies for wrongs committed by a third person, even if the incident also creates a compensable workers' compensation claim because the injury was caused by an accident that arose "out of and in the course of ... employment." *N.J.S.A.* 34:15-1.

It is in the face of those general principles, which permit only few and narrow exceptions to the rule prohibiting any direct actions against an insurer, that the Estate brings the instant action. We turn now to the Estate's issues on appeal.

### III.

The Estate made two direct-action arguments against defendants in this matter. In respect of its negligence claim against Dr. Wolf, the Estate argued that the co-employee immunity rule, as recognized in *Hawksby v. DePietro*, 165 *N.J.* 58, 754 *A.*2d 1168 (2000), should not bar its cause of action. In addition, the Estate claimed that, through Dr. Wolf and TIC's pre-approval processes for Basil's treatment regimen, TIC engaged in the direct medical care of Basil. In other words, the Estate seeks to have the insurer's actions viewed as if the insurer was not simply "standing in the shoes" of the employer when it was fulfilling the employer's obligations under the Act, but rather was engaging in separate negligent action that injured Basil. Although we note that Dr. Wolf is not part of this appeal, because the two arguments are intertwined we shall discuss both in our analysis, as did the Appellate Division.[8]

---

[8] After the trial court granted summary judgment to defendants, and denied plaintiff's motion to reconsider, Dr. Wolf and the Estate entered into a settlement. Thus, the Estate's claim against the physician was not actually before the panel. In the course of the Appellate Division's review of the grant of summary judgment to the carrier, however, the panel commented on the viability of the cause of action against the physician, stating its view that the immunity granted to co-employees under the Workers' Compensation Act, as interpreted by *Hawksby*, operated to bar any medical malpractice claim against the physician. In

## A.

 The Estate argued below that a direct action against Dr. Wolf was not barred because, unlike the physician involved in *Hawksby*, Dr. Wolf was not a co-employee of Basil. *Hawksby* applied the well-known "co-employee immunity" rule, which grants to a negligent employee immunity from suit by an injured co-worker, to an employer's full-time physician director of its on-site healthcare clinic. 165 *N.J.* at 60–61, 754 *A.*2d 1168. The Estate maintained that *Hawksby's* co-employee immunity holding did not apply in the present setting involving a contract physician who was engaged by an insurer to perform independent medical examinations. In *Hawksby*, the physician's immunity from common law liability arose from his status as a "person . . . in the same employ as the person injured." 165 *N.J.* at 64, 754 *A.*2d 1168 (quoting *N.J.S.A.* 34:15–8). Here, Wolf clearly was not a co-employee of Basil. Tellingly, the defendant insurer did not contest that before this Court. Dr. Wolf was not entitled to claim co-employee immunity from suit by Basil's Estate. Therefore, because *N.J.S.A.* 34:15–40 preserves common-law claims against third-parties, the workers' compensation remedy was not plaintiff's exclusive remedy.

The appellate panel went astray in this aspect of its discussion when it relied on the part of the *Hawksby* discussion that addressed whether a claim for aggravation of Hawksby's cancer had to be advanced in the Division of Workers' Compensation. The two incidents of alleged malpractice are similar: each involves the failure to detect cancer during treatment for a work-related injury. And, in *Hawksby*, that malpractice was recognized to constitute an "accident" under the Act.[9] However, the threshold

---

affirming today the Appellate Division judgment, we do not endorse the panel's application of co-employee immunity to Dr. Wolf.

[9] *Hawksby, supra,* required a determination whether the failure to diagnose a cancerous tumor in an employment setting was an "accident" because the

question, precedent to the application of the workers' compensation bar, is whether the physician can demonstrate co-employee status. Absent that necessary finding, the workers' compensation exclusivity bar is unavailable. Here, Dr. Wolf could not qualify as a co-employee and, therefore, the Estate's claim against him was not barred under the workers' compensation scheme.

Notwithstanding our disagreement with the panel that a claim could be advanced against Dr. Wolf, we agree in full with its rejection of any direct-action claim against the insurer based solely on its pre-approval authorization for Basil's treatment.

### B.

■ The Estate argues that a workers' compensation carrier can be, for purposes of the Act, a "third party" capable of being sued directly. *See N.J.S.A.* 34:15–40(g) (stating that "[t]he words, 'third person' as used in this section include corporations, companies, associations, societies, firms, partnerships and joint stock companies as well as individuals"). The Estate notes that that language does not preclude a finding that an insurer can be a third party for purposes of the Act and points to one of the few exceptions that has allowed a case to be filed directly against an insurer, *Mager v. United Hospitals of Newark,* 88 *N.J.Super.* 421, 212 *A.*2d 664 (App.Div.1965), *aff'd o.b.,* 46 *N.J.* 398, 217 *A.*2d 325 (1966).

In *Mager, supra,* we affirmed the Appellate Division's holding that the Workers' Compensation Act neither "expressly or impliedly, enjoin[s] an action against the employer's compensation carrier." *Id.* at 426, 212 *A.*2d 664 (noting that definition of "third parties" in Section 40 "does not exclude an employer's compensation carrier"). That said, *Mager's* import lies in its recognition that when a compensation carrier goes beyond merely arranging for and underwriting the provision of medical services required of

existence of a compensable "accident" was a prerequisite to the physician's invocation of co-employee immunity. 165 *N.J.* at 65, 754 *A.*2d 1168.

the employer by statute, the insurer can lose the protection of an employer's statutory immunity. In *Mager*, the insurer took it upon itself to directly and physically *perform* the services required under the Act by operating its own clinic. *Id.* at 422–23, 212 *A.*2d 664. The plaintiff's complaint alleged that the clinic's actions during the delivery of medical care negligently caused injury to the worker. *Ibid.* The decision in *Mager* explains that, in that instance, the "jural personalities" of the employer and the insurer were not one and the same and that, therefore, the worker could bring a common-law action against the insurer for the insurer's independently wrongful actions. *Id.* at 426, 212 *A.*2d 664.

Here TIC concedes the propriety of using the type of "functional analysis" involved in *Mager* in order to determine whether a compensation insurer should be stripped of an employer's immunity. However, TIC maintains that the dual and separate "jural personalities," found evident in *Mager*, do not exist in this instance. TIC argues that it did not act in any way that brought it outside of the employer's obligations under the Act, stripping it of the benefit of the exclusivity bar. In support, TIC cites *Rothfuss v. Bakers Mutual Insurance Co. of New York*, 107 *N.J.Super.* 189, 193, 257 *A.*2d 733 (App.Div.1969), in which negligence claims that an insurer failed "to furnish prompt and adequate medical treatment" were dismissed because the plaintiff's only remedy for that alleged failure was within the Division.[10]

This Court has used a functional analysis in *Mager, supra,* and also in later cases. For example, such an analysis was utilized by the Appellate Division majority in *Cortes, supra,* 232 *N.J.Super.* at 523–24, 557 *A.*2d 1019, which we affirmed. 115 *N.J.* 190, 557 *A.*2d

---

[10] On the other hand, TIC acknowledges that an insurer's affirmative acts can cause injuries that are not compensable solely within the workers' compensation scheme. In *Rothfuss, supra,* the plaintiffs brought separate claims that alleged that the insurer negligently ignored the advice of its own medical expert when making determinations about an injured worker's treatment. 107 *N.J.Super.* at 193, 257 *A.*2d 733. Those claims were held to be actionable and not barred by the workers' compensation exclusive remedy. *Ibid.*

1001 (1989). In *Cortes,* the plaintiff had sustained an on-the-job back injury and had commenced treatment with a physician. 232 *N.J.Super.* at 520, 557 *A.*2d 1019. After the physician excised a herniated disc, the plaintiff's back condition worsened. *Ibid.* When the physician sought authorization from the insurer to perform certain diagnostic tests, the insurer referred the plaintiff to one of its own consultants for a second opinion. *Id.* at 521, 557 *A.*2d 1019. At least one advised that the tests were unnecessary and, based on that advice, the insurer refused authorization. *Ibid.* The Appellate Division held that the plaintiff had no right to seek relief, based on the denial of that testing, through an action filed in the courts. *Id.* at 524, 557 *A.*2d 1019. The panel explained that the trial court erroneously had entertained jurisdiction over the claim based on the plaintiff's theory that the carrier had undertaken to treat, which is not a duty imposed on the carrier under the Act or under its insurance policy. *Id.* at 523, 557 *A.*2d 1019.

In explaining further why the exclusivity bar applied to the plaintiff's action, the *Cortes* panel further explained that,

[i]n the present case, [the insurer] did not undertake to treat [plaintiff] and did not *select or otherwise impose* [his treating physician] on him. [The insurer] exercised its right to question and evaluate [the treating physician]'s treatment plan. In doing so it acted responsibly in retaining non-treating consultants. Because [the insurer] did not undertake *to direct* treatment of [plaintiff, it] assumed no duty to [plaintiff] beyond its duty under the compensation act and its insurance policy. [*Id.* at 523–24, 557 *A.*2d 1019 (emphasis added).]

*See also Hinojo, supra,* 353 *N.J.Super.* at 270, 802 *A.*2d 551 (reiterating *Mager's* holding that "[t]he insurer of an employer's liability under the Workers' Compensation Act, *N.J.S.A.* 34:15–1 to –128, cannot assert the employer's immunity from tort liability ... if an insurer undertakes to perform services that go beyond simply providing workers' compensation coverage to an employer"), *certif. denied,* 175 *N.J.* 76, 812 *A.*2d 1109 (2002).

Applying a similar analysis to TIC's actions here, we conclude that the insurer only was performing services that were part and parcel to providing the workers' compensation coverage that it contractually had agreed with Basil's employer, Jasper, to provide.

TIC did not go outside that role when it required an independent examining physician to review, and approve of, a diagnostic and treatment plan for Basil, commensurate with the needs of Basil's earlier 1996 compensable injury. The insurer is not transformed into a medical services provider simply because it required a prior medical examination by Dr. Wolf [11] as part of its approval for Basil's treatment to remediate the 1996 injury covered by the workers' compensation plan. The trial court did not so find and neither did the Appellate Division when it reviewed whether the trial court should have granted summary judgment on this record. *See Brill v. Guardian Life Ins. Co. of Am.*, 142 *N.J.* 520, 540, 666 *A.*2d 146 (1995). We agree with the judgment of those courts.

TIC was not directing Basil's treatment. Rather, TIC was acting within the scope of the duty that Jasper owed to its employee, Basil, to wit, to facilitate the provision of medical care necessary to remediate the recurrence of pain allegedly caused by Basil's injuries from the prior compensable accident.

As the Appellate Division stated in this matter, an insurer differs from a provider:

Unlike a provider, an insurer has no duty with respect to acceptable standards for reaching a diagnosis or providing treatment. It simply has a duty to provide a qualified physician to diagnose and treat. This duty flows from the employer's duty pursuant to *N.J.S.A.* 34:15-15, which requires the employer to "furnish to the injured worker such medical, surgical and other treatment, and hospital service as shall be necessary to cure and relieve the worker of the effects of the injury and to restore the functions of the injured member or organ where such restoration is possible."

In sum, we reject the argument that the insurer's reasonable exercise of its treatment-approval protocols took it outside of the provision of the workers' compensation coverage. The facts do not provide a basis for concluding that TIC shed its statutory immunity by performing, on behalf of the employer, the very tasks

---

[11] We reject any argument that TIC engaged Dr. Wolf to be Basil's treating physician. The one form letter, sent after the fact to "cover" Dr. Wolf's writing of the initial prescription for Basil's physical therapy, is an insufficient reed to support such an argument.

the employer is required by law to perform. We affirm the Appellate Division's judgment holding that, on these facts, there is no direct action available against TIC.

IV.

■ As an alternative basis for its claim, having failed on its assertion of a direct action against the compensation carrier, the Estate seeks to impute Dr. Wolf's alleged negligence to TIC. The Estate advances several theories for its claim that the insurer should be held vicariously liable for the acts of Dr. Wolf, relying on exceptions to the long-settled rule that a principal ordinarily is immune for the negligent acts of an independent contractor, or that of its employees, in the performance of the contracted services. *See Terranella v. Union Bldg. & Constr. Co.*, 3 *N.J.* 443, 446–47, 70 *A.*2d 753 (1950); *Mann v. Max*, 93 *N.J.L.* 191, 193, 107 *A.* 417 (E. & A.1919). Specifically, the Estate seeks to hold TIC vicariously liable for the acts of its independent contractor, Dr. Wolf, under the "control" and "incompetent contractor" exceptions to that immunity. *See Majestic Realty Assocs., Inc. v. Toti Contracting Co.*, 30 *N.J.* 425, 430–32, 153 *A.*2d 321 (1959).

■ *Majestic, supra*, set forth the general principle that "where a person engages a contractor, who conducts an independent business by means of his own employees, to do work not in itself a nuisance ... he is not liable for the negligent acts of the contractor in the performance of the contract." 30 *N.J.* at 430–31, 153 *A.*2d 321. The immunity granted to a principal who hires an independent contractor rests on the distinction between an independent contractor and an employee. Generally stated, "an independent contractor, in contrast to the average employee, 'contracts to do certain work according to his own methods, without being subject to the control of his employer except as to the product or result of his work.'" *Pfenninger v. Hunterdon Cent. Reg'l High Sch.*, 167 *N.J.* 230, 252, 770 *A.*2d 1126 (2001) (quoting 5 *Am.Jur.2d Proof of Facts* § 219 (1975)). Thus, the difference between an employee and an independent contractor is essentially that,

one who hires an independent contractor

"has no right of control over the manner in which the work is to be done, it is to be regarded as the contractor's own enterprise, and he, rather than the employer is the proper party to be charged with the responsibility for preventing the risk, and administering and distributing it."

[*Baldasarre v. Butler*, 132 *N.J.* 278, 291, 625 *A.*2d 458 (1993) (quoting W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 71 (5th ed. 1984)).]

█ In *Majestic*, we discussed several exceptions to the general rule of immunity granted to a principal for the negligent acts of an independent contractor. Liability may be imputed to a principal for the actions of independent contractors: (1) where the principal retains control of the manner and means of doing the work that is the subject of the contract; (2) where the principal engages an incompetent contractor; or (3) where the activity constitutes a nuisance per se. *Majestic, supra*, 30 *N.J.* at 431, 153 *A.*2d 321. The Estate claims the first two here.

█ The Estate asserts one additional theory for the imputation of liability. If a principal cloaks an independent contractor with apparent authority or agency, the principal can be held liable as if the contractor were its own employee if it held out the contractor to the plaintiff as its own servant or agent. *See Arthur v. St. Peters Hosp.*, 169 *N.J.Super.* 575, 581, 405 *A.*2d 443 (Law Div. 1979); *see also Restatement (Second) of Agency* § 267 (1958). The Estate argues for vicarious liability on that ground as well. In sum, the Estate seeks to impute Dr. Wolf's alleged negligence to TIC based on three grounds—(1) TIC's control of the means and manner of the contractor's performance; (2) TIC's having created apparent authority in Dr. Wolf for the purposes of the IME; and (3) TIC's negligent hiring of an incompetent contractor.

A.

█ In respect of the control exception, the reasoning underlying the imputation of liability is as follows. Where a principal exerts more and more control over the means and manner by which an independent contractor performs his services, the principal becomes more than a mere supervisor and loses the

immunity shield that would otherwise exist. *Majestic, supra,* 30 *N.J.* at 431, 153 *A.*2d 321. Under the test for control, "the [principal's] reservation of control over the equipment to be used, the manner or method of doing the work, or direction of the employees of the independent contractor may permit vicarious liability." *Mavrikidis v. Petullo,* 153 *N.J.* 117, 135, 707 *A.*2d 977 (1998).

Neither of the courts below found that the insurer in this case exercised the type of control over the means and methods by which Dr. Wolf performed his medical functions sufficient to lose its immunity as a principal. The facts amply support that conclusion. Basil suffered his work injury in September 1996 and, more than a year later, requested additional medical services based on an exacerbation of pain associated with that prior injury. Over the next three years he was seen by several doctors. Eventually, there was a late diagnosis of a sarcoma and Basil died in September 2000 from the cancer. During that time, TIC required Basil to be evaluated for purposes of treatment approval. For that, TIC used a physician of its choosing (Wolf) who, given the posture of this appeal, we assume to have acted negligently. The insurer communicated with both Dr. Wolf and Basil, requiring "that prior authorization for any special services, such as physical therapy, diagnostic tests, durable medical equipment, etc., must be obtained from [the insurer]." (emphasis omitted).

The question is whether, in asking Dr. Wolf to evaluate Basil's medical condition and furnish a report, in authorizing payment for certain treatments and further evaluations, and in requiring a physician to pre-authorize diagnostic tests with the insurer before they are performed (provided the insurer is to be required to pay for those tests), the insurer thereby controlled its medical contractor's work product by controlling the means and manner in which it was performed.

Taking the insurer's initial letter to Dr. Wolf in the light most favorable to Basil's claim, the insurer directed Dr. Wolf to conduct a medical workup of Basil for the purposes of evaluating

whether Basil's recurrence of pain was related to the prior work-
place injury. When an insurer requests a contract physician to
perform a physical examination and to report back the results of
that exam, the insurer is not engaging in the sort of "control"
anticipated by the description of that exception in *Majestic.*
Rather, as the courts below held, TIC simply was requesting a
given product—namely, Dr. Wolf's medical judgment on whether
Basil's ills were work-related. The insurer did not instruct Dr.
Wolf on how to conduct his medical exam, what sort of data to
consider, or in what way he should come to his professional
opinion. It merely contracted for a report and received it. It
certainly did not compel any particular technique, methodology, or
outcome from that examination.

Further, in authorizing the issuance of prescriptions for physical
therapy and, eventually, various diagnostic tests that Dr. Wolf
independently had concluded were appropriate for Basil's ap-
proved course of treatment, the insurer did not direct Dr. Wolf, or
indeed any of the other doctors who saw Basil on TIC's referral,
on what care each could or should approve. The prescriptions
actually issued by Dr. Wolf were simply the mechanism by which
the insurer would authorize payment for specific, approved diag-
nostic techniques. In sum, the insurer did not suggest to the
physicians how to exercise their independent medical judgments
about what treatment to approve for Basil. On the contrary, the
medical treatment decisions were the result of independent recom-
mendations from the doctors. We are satisfied that the lower
courts correctly determined on this record that the insurer did not
"control" the IME doctor in the conduct of his examination and
evaluation of Basil for treatment authorization purposes, certainly
not to a degree sufficient to trigger the "control" exception. Nor
was "control" triggered by the insurer's practice of insisting that,
before a test or treatment is conducted for which the insurer
would pay, insurer approval must first be obtained.

A distinction must be drawn between the insurer's act of
preventing a doctor from giving treatment to a compensation

claimant and its refusal to pay for that treatment absent prior consent. As a matter of basic cost control, insurance companies often require pre-authorization before agreeing to pay for certain medical care and diagnostic tests. To find that pre-authorization requirements constitute sufficient control to satisfy the *Majestic* exception would vastly extend vicarious liability for medical malpractice to insurance companies. No cogent reason has been advanced for such a sweeping extension of the control exception. Indeed, such an extension would result in the exception swallowing the rule against vicarious liability of an independent contractor in such a setting. Therefore, applying the *Brill* standard to the facts as presented in this record, we affirm the Appellate Division judgment that, in these circumstances, the insurer is not vicariously liable for Dr. Wolf based on a control theory of vicarious liability.[12]

### B.

Plaintiff also raises a vicarious liability argument on the basis of apparent authority. *See Restatement (Second) of Torts* § 429 (1965). Our courts and others have applied this theory in the context of health maintenance organizations (HMOs) and hospitals that held out to the public independent contractor physicians in a manner that implied they were agents or employees of the HMO or hospital, thus imputing vicarious liability. *See Dunn v. Praiss,* 139 *N.J.* 564, 569, 656 *A.*2d 413 (1995); *Dunn v. Praiss,* 256 *N.J.Super.* 180, 193–95, 606 *A.*2d 862 (App.Div.1992), *rev'd on other grounds,* 139 *N.J.* 564, 656 *A.*2d 413 (1995); *Arthur, supra,* 169 *N.J.Super.* at 581, 405 *A.*2d 443; *see also Petrovich v. Share Health Plan of Ill., Inc.,* 188 *Ill.*2d 17, 241 *Ill.Dec.* 627, 719 *N.E.*2d 756, 766 (1999); *Raglin v. HMO Ill., Inc.,* 230 *Ill.App.*3d 642, 172

---

[12] To the extent that our colleague comes to a different conclusion about the correctness of the grant of summary judgment on the issue of control, we respect his right to disagree. In our view, the courts below did not act inappropriately in concluding that TIC was entitled to judgment.

*Ill.Dec.* 90, 595 *N.E.*2d 153, 156 (1992); *Boyd v. Albert Einstein Med. Ctr.,* 377 *Pa.Super.* 609, 547 *A.*2d 1229, 1234 (1988).

As best explained in *Arthur, supra,* apparent authority imposes liability on the principal "not as the result of the reality of a contractual relationship but rather because of the actions of a principal or an employer in somehow misleading the public into believing that the relationship or the authority exists." 169 *N.J.Super.* at 580, 405 *A.*2d 443. The key question "is whether the principal has by his voluntary act placed the agent in such a situation that a person of ordinary prudence, conversant with business usages and the nature of the particular business, is justified in presuming that such agent has authority to perform the particular act in question." *Ibid.* (quoting *Hudson Coop. Loan Ass'n v. Horowytz,* 116 *N.J.L.* 605, 608, 186 *A.* 437 (Sup.Ct.1936)). Thus, in the context of a hospital and its independent contractor physicians, there would be apparent authority "[i]n those cases where it can be shown that a hospital, by its actions, has held out a particular physician as its agent and/or employee and that a patient has accepted treatment from that physician in the reasonable belief that it is being rendered in behalf of the hospital." *Id.* at 581, 405 *A.*2d 443.

The Estate's extension of that rationale to a workers' compensation insurance carrier is novel and without precedent. In order to establish apparent authority in this case, the Estate would have to show both that the insurer, in its communications to Basil, conveyed and intended to convey that Dr. Wolf was its treating physician for Basil, *and* that Basil acted in reliance on such a reasonable, but falsely created, impression to that effect. That showing simply does not exist in this record. The Appellate Division correctly affirmed the dismissal of that claim.

## C.

Finally, we address whether TIC can be held vicariously liable for hiring an incompetent contractor when it engaged Dr. Wolf to perform its IME and follow-up examinations of Basil.

Imputation of liability for hiring an incompetent contractor is derived from basic negligence principles. Our courts have long recognized this exception. *See Bergquist v. Penterman*, 46 *N.J.Super.* 74, 84, 134 *A.2d* 20 (App.Div.) (citing *Healy v. Sayre*, 113 *N.J.L.* 308, 311, 174 *A.* 534 (E. & A.1934)), *certif. denied*, 25 *N.J.* 55, 134 *A.2d* 832 (1957). Generally stated, the incompetent contractor exception operates on the principle that

[a]n employer is subject to liability for physical harm to third persons caused by his failure to exercise reasonable care to employ a competent and careful contractor (a) to do work which will involve a risk of physical harm unless it is skillfully and carefully done, or (b) to perform any duty which the employer owes to third persons.

[*Restatement (Second) of Torts* § 411 (1965); *see also Bergquist, supra,* 46 *N.J.Super.* at 84, 134 *A.2d* 20 (citing earlier version of § 411 as it appeared in *Restatement of Torts* § 411 (1934)).]

Comment a to Section 411 defines a competent and careful contractor as "a contractor who possesses the knowledge, skill, experience, and available equipment which a reasonable man would realize that a contractor must have in order to do the work which he is employed to do without creating unreasonable risk of injury to others." Comment b to Section 411 further explains:

The employer of a negligently selected contractor is subject to liability under the rule stated in this Section for physical harm caused by his failure to exercise reasonable care to select a competent and careful contractor, but only for such physical harm as is so caused. In order that the employer may be subject to liability it is, therefore, necessary that harm shall result from some quality in the contractor which made it negligent for the employer to entrust the work to him.

In other words, to prevail against the principal for hiring an incompetent contractor, a plaintiff must show that the contractor was, in fact, incompetent or unskilled to perform the job for which he/she was hired, that the harm that resulted arose out of that incompetence, and that the principal knew or should have known of the incompetence. In this instance, the Estate alleges that Dr. Wolf is an incompetent contractor because he allowed his malpractice insurance to lapse when he ceased patient care and performed only IMEs.

Until not long ago, *Mavrikidis, supra,* 153 *N.J.* at 138–42, 707 *A.2d* 977, was our last word on the application of the exception when the alleged defect concerned a lack of insurance. However,

in a case of more recent vintage, *Puckrein v. ATI Transport, Inc.*, 186 *N.J.* 563, 578–81, 897 *A.*2d 1034 (2006), we considered the issue of contractor incompetence based on, among other things, a failure of insurance. In *Puckrein*, a truck hired by the defendant to transport glass residue and solid waste killed some plaintiffs and maimed others. *Id.* at 567–68, 897 *A.*2d 1034. In assessing the defendant's liability on the theory that it hired an incompetent contractor, we noted that under our law, "the hauler's basic competency included, at a minimum, a valid driver's license, a valid registration certificate, and a valid liability insurance identification card. *N.J.S.A.* 39:3–29. Without those, the hauler has no right to be on the road at all." *Id.* at 578, 897 *A.*2d 1034. Because the truck had no insurance identification card and an expired registration, it was "not competent" to transfer the principal's waste. *Id.* at 579–80, 897 *A.*2d 1034. The issue was whether the principal "violated its duty to use reasonable care in selecting a trucker and whether it knew or should have known of the [trucker's] incompetence." *Id.* at 579, 897 *A.*2d 1034.

In holding that the facts were sufficient to withstand summary judgment on the issue of the principal's liability, we returned to the concepts relevant to the duty of inquiry:

"[A principal] may be charged with negligence in hiring an independent contractor where it is demonstrated that he should have known, or might by the exercise of reasonable care have ascertained, that the contractor was not competent." Reuben I. Friedman, Annotation, *When is Employer Chargeable with Negligence in Hiring Careless, Reckless, or Incompetent Independent Contractor,* 78 *A.L.R.*3d 910, 916 (1977); *see also* J.D. Lee & Barry A. Lyndahl, *Modern Tort Law* § 8.03 (1991)("An employer may be liable for the negligent acts of an independent contractor if the employer fails to exercise due care in the selection of a competent independent contractor."); W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 71 (5th ed. 1984)(same). The extent of the inquiry obviously depends on the status of the principal and the nature of the task that the contract covers.... [A] principal who hires a contractor to paint or pave or install electrical outlets need not inquire whether its pickup trucks are inspected and insured. Likewise, a casual shipper of goods has a right to assume that the carrier is not conducting business in violation of the law. On the contrary, a company whose core purpose is the collection and transportation of materials on the highways, has a duty to use reasonable care in the hiring of an independent trucker including a duty to make an inquiry into that trucker's ability to travel legally on the highways. At a minimum, [the principal] was required to inquire whether its haulers had proper insurance and registration

> because without those items the hauler had no right to be on the road. Just as [the principal] itself could not have transported products in unregistered and uninsured trucks, it was not free to engage an independent contractor that did so. [*Puckrein, supra,* 186 *N.J.* at 579–80, 897 *A.*2d 1034.]

We explained that there was a question of fact regarding whether the principal made a reasonable inquiry of the trucker initially and that a continuing duty of inquiry existed. *Id.* at 580–81, 897 *A.*2d 1034.

> Even if it could be proved that [the principal] made reasonable inquiry of [its independent contractor] at the time of its original retention, its duty did not end there. *See* Friedman, *supra,* 78 *A.L.R.*3d at 920 (explaining that although originally unaware that contractor was incompetent, employer who acquires knowledge of incompetence thereafter may be liable for inaction) (citing *Peck v. Woomack,* 65 *Nev.* 184, 192 *P.*2d 874 (1948); *Kuhn v. P.J. Carlin Const. Co.,* 154 *Misc.* 892, 278 *N.Y.S.* 635 (N.Y.Sup.Ct.1935), *aff'd,* 248 *A.D.* 582, 288 *N.Y.S.* 1110 (1936), *rev'd on other grounds,* 274 *N.Y.* 118, 8 *N.E.*2d 300 (1937)). By April 1998, [the independent contractor]'s insurance certificate, on file with [the principal], had expired. Despite its continuing duty to inquire, [the principal] never did so although it continued to allow [the independent contractor]'s trucks to transport its glass residue. In other words, at a point after the original retention but before plaintiffs' accident, [the principal] should have known that [its independent contractor] had become incompetent to transport its products. Yet, according to the record, [the principal] continued to load [the independent contractor's] ... trucks without evidence that they were competent to transport its products. Under the circumstances, summary judgment in [the principal]'s favor should not have been granted. [*Puckrein, supra,* 186 *N.J.* at 580–81, 897 *A.*2d 1034.]

■ *Puckrein* now informs our incompetent contractor analysis. At issue is whether, when TIC engaged Dr. Wolf to examine Basil, the insurer was engaging an "incompetent contractor." According to the Estate, that incompetence arises out of Dr. Wolf's failure to maintain malpractice insurance. Some preliminary points help to sharpen that inquiry.

On January 19, 1998, the Legislature enacted *N.J.S.A.* 45:9–19.17, to become effective sixty days thereafter. *L.* 1997, c. 365, § 3 (amended 2004). It requires that "[a] physician who maintains a professional medical practice in this State and has responsibility for patient care is required to be covered by medical malpractice liability insurance ... or, if such liability coverage is not available, by a letter of credit...." *N.J.S.A.* 45:9–19.17(a).[13]

---

[13] In 2004, *N.J.S.A.* 45:9–19.17 was amended to include a specific amount of malpractice insurance that was required to be maintained by physicians having a

In creating that medical malpractice insurance requirement, the Legislature declared that it "intended to ensure the citizens of the State that they will have some recourse for adequate compensation in the event that a physician or podiatrist is found responsible for acts of malpractice." Assemb. Health Comm., *Statement to S. 267* (N.J. 1996); *see also* S. Health Comm., *Statement to S. 267* (N.J. 1996).

Pursuant to its regulatory authority, the State Board of Medical Examiners thereafter promulgated *N.J.A.C.* 13:35–6.18, which provided a definition for the phrase, "maintaining a professional practice with responsibility for patient care." Adopted on April 5, 1999, more than a year after *N.J.S.A.* 45:9–19.17 became law, the rule clarified that

"Maintaining a professional practice with responsibility for patient care" means the furnishing of professional services to patients in New Jersey, including, but not limited to, the testing for, or diagnosis of, or the offering or furnishing of treatment, preventative medical care or consultation relating to human disease or dysfunction or physical condition, including the prescribing, administering or dispensing of products, devices or drugs at a place, such as an office (even if located in a home), hospital or clinic, or through a business entity, such as a laboratory or mobile van service.

[*N.J.A.C.* 13:35–6.18.]

Plainly, once that definition was adopted, the Board provided clear and sufficient notice that it intended to encompass all "furnishing of professional services, including consulting as well as direct treatment, if provided at a place or through a business entity." 30 *N.J.R.* 4318(a) (Dec. 21, 1998). The Board's rule proposal explicitly noted that by "including consulting and prescribing within the definition ... the Board is providing a broad remedy for patients" and "captur[ing] a wide breadth of professional services." *Ibid.* According to the Board, only "licensees who do not maintain an office or practice out of a hospital or clinic, such as a retired licensed physician who occasionally provides medical services to friends and family, would not be mandated to

professional practice with responsibility for patient care in New Jersey. *See L.* 2004, *c.* 17, § 25 (amended 2004).

secure malpractice coverage...." *Ibid.* Upon the enactment of that clearly expressed regulation, all practitioners, and therefore insurers who contract with them, were on notice that, with the exception of the denominated exclusion, any physician who does not satisfy the insurance requirement would be incompetent to practice his profession.

That requirement, as clarified by the Board's regulatory enactment, plainly would apply to Dr. Wolf if he were continuing to maintain an office and performing examinations of patients and consultations. He could not have had his license renewed without demonstrating the necessary malpractice insurance. *See N.J.S.A.* 45:9–19.17(a) (requiring physicians to notify Board of compliance with malpractice insurance requirement through biennial license renewal submission pursuant to *N.J.S.A.* 45:9–19.7). Although having malpractice insurance would have been a condition of Dr. Wolf's eligibility for re-licensure, the requirement was not yet a clear legal obligation, or condition, of his existing license when Dr. Wolf initially was engaged by TIC and performed the IMEs of Basil. The clarity of such a requirement certainly emerged once the Board promulgated its regulation informing physicians who would be covered by the insurance requirement. But, we cannot say that, when Dr. Wolf examined Basil and wrote the prescriptions that TIC requested for payment authorization purposes, that there was a clear legal requirement, as a condition of Dr. Wolf's eligibility to practice under his then-current license, that he obtain and maintain malpractice insurance.

At most, the statute informed licensees that a physician in violation of the statute could be subject to disciplinary action, *N.J.S.A.* 45:9–19.17(b), but no form of direct action against a physician was authorized. We cannot conclude from the timing of the underlying events in this matter and of the enactment of the statute and its latter clarifying regulation that Dr. Wolf's lack of insurance rendered him, from the perspective of TIC, an "incompetent contractor" as a matter of law. Indeed, at the time, our holding in *Mavrikidis* would have supported the contrary conclu-

sion because it had rejected an argument that the hauler's failure to have motor vehicle insurance rendered it an incompetent contractor for purposes of imputing liability. Accordingly, we hold that the incompetent-contractor exception does not apply to the insurer in this matter because the duty to inquire that now may be expected of insurers would not have been triggered at the significant dates of this matter.

That said, State regulations now clearly require practicing physicians maintaining a professional office, as defined, to obtain a minimum amount of medical malpractice insurance as a condition for licensure. See N.J.A.C. 13:35–6.18. An IME contract physician who lacked malpractice insurance *after* April 5, 1999 (the effective date of the regulation that defined the term "maintaining a professional practice with responsibility for patient care" for purposes of imposing the insurance requirement), is unqualified to practice medicine. Consistent with our 2006 holding in *Puckrein, supra,* an insurance company that engages an IME physician for evaluative purposes now must be aware that it is under a continuing duty of inquiry in respect of malpractice insurance requirements in order to ensure that the physicians it engages are qualified to practice.[14]

---

[14] Our dissenting colleague expresses the concern that our holding deprives a duly enacted statute of effect until an implementing regulation is adopted. The dissent overstates our holding. Our holding is limited to determining whether it reasonably could be said that TIC should have known that it was engaging an alleged "incompetent" IME contractor because of the new insurance requirement. Based on the unique facts here in respect of TIC and Dr. Wolf, our determination merely takes into account the timing of Dr. Wolf's examinations of Basil and the fact that there was not yet clear notice from the Board that physicians performing only IME examinations would be subject to the malpractice requirement as a condition of licensure. Moreover, the record nowhere suggests that Dr. Wolf's license expired during the relevant period and that he sought and was denied re-licensure for failure to abide the insurance requirement. In short, we regard the date that the Board adopted its position on who was "maintaining" an office for the practice of medicine and, therefore, who would be obligated to satisfy the minimum malpractice insurance requirement, as the operative date for fairly imposing a duty to inquire on the insurer in this matter. The events in this matter preceded that effective date.

## V.

The judgment of the Appellate Division is affirmed.

Justice ALBIN, concurring in part, and dissenting in part.

John Basil died because his employer's workers' compensation carrier did not furnish him with the necessary medical care to treat his workplace injuries. Under the workers' compensation statute, *N.J.S.A.* 34:15–15, an employer is required to furnish medical care to an injured worker. In the circumstances of this case, it is reasonable to conclude that Basil's employer delegated that responsibility to Transportation Insurance Company, the employer's workers' compensation carrier.

Basil died because the carrier sent him for evaluation and treatment to an "incompetent" physician—a physician who, while treating Basil, did not maintain the statutorily-required malpractice insurance necessary to practice medicine in this State; a physician who negligently failed to diagnose and treat a cancerous tumor related to Basil's workplace injury; a physician who surrendered his independent, professional judgment for the care of his patient to the carrier's cost-saving functionaries. Those are the facts viewed in the light most favorable to plaintiff, Basil's widow. If believed by a jury, the evidence would support a finding that the carrier negligently retained the "incompetent" physician and improperly exercised control over Basil's medical treatment, resulting in his wrongful death.

The majority has not given Mrs. Basil the benefit of her best case as required on a summary judgment motion, but has instead improperly weighed the evidence as though it were a jury. Because I believe that Mrs. Basil has presented sufficient evidence to have the carrier answer in court for the wrongful death of her husband, I respectfully dissent.

## I.

Basil was employed as the Branch Manager at Jasper Engines and Transmission Company (Jasper) in Fairfield, New Jersey on

September 27, 1996, when he fell while moving an engine in a Jasper warehouse. He suffered injuries to his abdomen, back, and right middle finger, and experienced an immediate "pulling" in his rib cage. A little more than a week later, he felt a "ball or knot" in his rib cage, which caused intense pain for brief periods when he sat in certain positions.

On the day of the accident, Basil went to see his chiropractor, who treated him over the course of five visits, ending on November 19, 1996. Jasper's workers' compensation carrier, defendant Transportation Insurance Company (the carrier), paid for those visits. Basil managed "sporadic episodes" of pain with ibuprofen.

A year later, in December 1997, when Basil experienced increased pain in his rib cage unrelated to any new injury, he resumed treatment with his chiropractor. However, the carrier refused to pay for chiropractic services, and its Claims Service Representative (CSR), Pamela Hudson, told the chiropractor's office that "if [Basil] needs *treatment* I can set him up [with] an orthopedist." [1] (Emphasis added). The carrier then referred Basil to Frank Wolf, M.D., a New Jersey-licensed physician who had discontinued both his orthopedic surgery practice and his medical malpractice insurance in 1993. From that date until 2001, Dr. Wolf performed independent medical examinations for insurance companies and attorneys.

In a letter dated January 14, 1998, CSR Hudson instructed Dr. Wolf to examine "Basil for evaluation purposes only" and "to determine whether [he] has sustained any permanent disability as a result of [Basil's workplace] injury." Dr. Wolf also was told to "obtain a detailed medical and work history and comment on causal relationship, diagnosis, and need for additional treatment." A week later, Dr. Wolf examined Basil and found "an area of fullness in the area between the lower rib cage and sternum." Without any x-rays or "special studies," Dr. Wolf diagnosed the problem as a "probable hematoma" caused by a "stretching and

---

[1] Basil continued his treatments with the chiropractor at his own expense.

tearing" involving the abdominal muscle and muscles and tissues within and attached to the rib cage. In a letter to the carrier dated January 20, 1998, Dr. Wolf advised that Basil "should benefit from additional treatment in the form of physical therapy." Dr. Wolf wrote a prescription for physical therapy, but forwarded it to the carrier rather than to Basil.

On February 3, 1998, CSR Hudson addressed a letter to Dr. Wolf, advising him that "the above captioned claimant [John Basil] has been referred to your office for treatment for injuries sustained as a result of a work related injury." The letter requested "timely medical reports relating to the claimant's progress, expected course of treatment" and instructed that "prior authorization" must be received from the carrier before undertaking "any special services" or "diagnostic tests." That same day, CSR Hudson placed a note in Basil's file memorializing that she had forwarded a "letter to Dr. Wolf authorizing any necessary takeover treatment." Dr. Wolf did not respond to that letter characterizing him as the treating physician.

Basil had doubts about Dr. Wolf's recommendation of physical therapy. He informed the carrier that because he "[felt] a lump in his rib area," he thought he first should have an x-ray or MRI to rule out a muscle tear. Remarkably, up to that point, neither Dr. Wolf nor any of the carrier's representatives had authorized an x-ray or MRI to determine the exact nature of Basil's medical problem.

On February 23, 1998, Basil's claim was reassigned to Claim Representative (CR) Lorraine Crecco. On April 7, 1998, Basil's attorney sent a letter to the carrier, urging that it "permit active medical treatment" of Basil. Not until a month later, on May 6, did the attorney receive a response in the form of a telephone call from CR Crecco, who told him that Basil had not gone for physical therapy as prescribed by Dr. Wolf. CR Crecco, apparently, did not appreciate the need for an x-ray or MRI or Basil's overriding and understandable concern that physical therapy might worsen his condition.

At the attorney's request, CR Crecco scheduled a "reevalu-at[ion]" of Basil with Dr. Wolf. As a result of that examination on May 26, 1998, Dr. Wolf wrote the carrier that pain in Basil's rib cage area continued and that "the area 'jumped' when touched." He noted that Basil's "right lower rib area feels 'like a golf ball' rolling and tingling." Nevertheless, Dr. Wolf's diagnosis remained the same as in his first report: "probable hematoma." He concluded that "further study ought to be completed for confirmation or modification of diagnosis.... A simple chest and rib x-ray series would be the logical first step and if necessary an MRI." Moreover, Dr. Wolf's clinical notes from the examination indicated that Basil could not sit up from a lying-down position without assistance and that the "patient needs studies, x-rays, possible MRI to follow." Dr. Wolf, however, documented in his report to the carrier that Basil "wishe[d] to continue with treatment in proximity to his home geographic area and; therefore, has been advised that this examination does not establish nor imply a patient-physician relationship."

Despite Dr. Wolf's findings in May 1998, the carrier did not authorize chest and rib x-rays until September 11, 1998, and then only in response to a lawyer's letter. It took yet another month for CR Crecco to direct Dr. Wolf to "give [Basil] a prescription to obtain a simple chest and x-ray series." Two weeks later, Dr. Wolf called in a prescription to Pocono General Hospital to perform a "chest and right thoracic wall standard [x-ray]" on Basil. A hospital technician reported orally to Dr. Wolf that the results were negative and that an MRI of the "right lower chest wall" was recommended.

Dr. Wolf, however, did not report the x-ray result and MRI recommendation to the carrier until four months later in a letter dated February 26, 1999. In that letter, Dr. Wolf noted a number of "diagnostic possibilities" to account for the lump in Basil's chest, including that of a "tumor ... that may remain undetectable on physical examination or even standard tests." Even so, Dr. Wolf did not advise the carrier that an MRI was necessary, only

that one "be considered." He also recommended "that [Basil] be referred to a thoraco-abdominal surgeon for further assessment and treatment of this nebulous mass."

On March 3, 1999, Basil's attorney requested that the carrier give its authorization for Basil to be treated by a thoracic-abdominal surgeon and to undergo an MRI, as recommended by Dr. Wolf. Three weeks later, CR Crecco referred Basil for treatment with Dr. Aaron H. Chevinsky, a thoracic surgeon. On October 26, 1999, imaging and biopsy of Basil's abdominal wall revealed a "huge retroperitoneal tumor."

Basil died of stage IV sarcoma on September 17, 2000 at the age of 56.

## II.

Those are the facts most favorable to plaintiff. The majority should have referenced *only* those facts at this procedural stage of the case. Under our summary judgment jurisprudence, plaintiff also was entitled to the benefit of the most favorable inferences to be drawn from those facts. *R.* 4:46–2(c); *see also R.A.C. v. P.J.S.*, 192 *N.J.* 81, 87 n. 2, 927 *A.*2d 97 (2007) (noting that in summary judgment motion "we must view the facts in the light most favorable to the non-moving party . . . and give him the benefit of all favorable inferences in support of [his] claim" (internal quotation omitted)); *Brill v. Guardian Life Ins. Co. of Am.*, 142 *N.J.* 520, 540, 666 *A.*2d 146 (1995).

The most favorable facts and inferences clearly would allow a jury to conclude that Dr. Wolf was Basil's treating physician. When the carrier refused to pay for chiropractic services, CSR Hudson called Basil's chiropractor's office and stated that if he "needs treatment I can set him up [with] an orthopedist." CSR Hudson then sent Basil to see Dr. Wolf, an orthopedist, who conducted a physical examination. Later, in a letter, CSR Hudson unambiguously informed Dr. Wolf that Basil was referred to him "for treatment for injuries sustained as a result of a work related injury." In addition to examining and diagnosing Basil on two

occasions, Dr. Wolf wrote a prescription for physical therapy for Basil in January 1998 and a prescription for an x-ray in October 1998. A hospital technician read to Dr. Wolf a report containing the results of the x-ray and a recommendation that an MRI be performed. Dr. Wolf, in turn, recommended that the carrier consider both authorizing an MRI and referring Basil to a specialist. Issuing prescriptions, directing tests, and conducting examinations, as Dr. Wolf did, is consistent with the actions of a treating physician. From the totality of his interactions with Dr. Wolf, Basil had reason to believe that he was Dr. Wolf's patient, not just a claimant undergoing an independent medical examination for the carrier.

It is true that a jury, accepting other facts and inferences, could reach a different conclusion. But a court should not accept the moving party's storyline on a summary judgment motion. The majority has erred by adopting the facts and inferences that place the carrier in the best light by casting Dr. Wolf as an independent medical examiner. The majority has made the same error in concluding that the carrier did not exercise control over the course of Basil's medical treatment. By giving the carrier, rather than plaintiff, the benefit of its best case, the majority has turned our summary judgment standard on its head.

Here, plaintiff's best evidence suggests that the carrier not only interfered with Basil's medical treatment, but delayed vital diagnostic testing that might have timely uncovered the metastasizing cancerous tumor that eventually killed Basil. As evidence of the control the carrier exercised, Dr. Wolf sent the physical therapy prescription to the carrier rather than the patient. Although Basil had "a lump in his rib area," the carrier would not authorize a simple x-ray but instead expected Basil to pursue a physical therapy regimen, which might have exacerbated his condition. Only after being hounded by Basil's attorney did the carrier move, and then at glacial speed, toward furnishing Basil the medical treatment to which he was entitled under the Workers Compensation Act, *N.J.S.A.* 34:15–1 to–142.

In May 1998, having detected a golf-ball-sized growth in Basil's rib area, Dr. Wolf wrote to the carrier that "[a] simple chest and rib x-ray series would be the logical first step." It took four months for the carrier to authorize the x-rays, and another month for it to direct Dr. Wolf to issue the x-ray prescription. Although the need for an MRI would have been obvious to a first-year medical student, Dr. Wolf only recommended that an MRI "be considered," and then awaited instructions from the carrier. Dr. Wolf seemingly abandoned his own professional independence and judgment and left to insurance company claims representatives the ultimate decision of whether Basil should receive timely, and potentially life-saving, diagnostic testing.

In the light most favorable to plaintiff, the record reveals a dawdling physician, indifferent to his patient's needs, and an insurance company in full control of the patient's course of treatment, slowly dispensing authorization for medically-needed tests and treatment.

### III.

Plaintiff contends that her husband's treating physician, Dr. Wolf, was practicing medicine while not carrying malpractice insurance in violation of *N.J.S.A* 45:9–19.17. Plaintiff submits that Dr. Wolf's failure to carry statutorily-required malpractice insurance rendered him an "incompetent" physician—a physician who did not possess the essential qualifications to practice medicine. In other words, without maintaining malpractice insurance, Dr. Wolf should not have been treating patients or even conducting independent medical examinations. In that latter regard, it bears mentioning that a physician owes the same duty of care to a person who is being examined and diagnosed for specific complaints during an independent medical examination as would be owed to a "traditional" patient presenting those complaints. *See Ranier v. Frieman*, 294 *N.J.Super.* 182, 192, 682 *A.*2d 1220 (App.Div.1996).

Ordinarily, the negligence of an independent contractor, such as Dr. Wolf, would not be imputed vicariously to the entity that retained him. *Majestic Realty Assocs. v. Toti Contracting Co.*, 30 *N.J.* 425, 430–31, 153 *A.2d* 321 (1959). That is so because, typically, a principal who hires an independent contractor has no right to control the contractor's work. *Baldasarre v. Butler*, 132 *N.J.* 278, 291, 625 *A.2d* 458 (1993). Under those circumstances, the contractor, rather than the principal, is deemed solely responsible for any dangers and risks arising from his own work. *Ibid.* There are, however, exceptions to that general rule.

### A.

One exception is when a principal hires an independent contractor who the principal knows or has reason to know is incompetent to perform the task. *Mavrikidis v. Petullo*, 153 *N.J.* 117, 137, 707 *A.2d* 977 (1998). The incompetent contractor exception is perfectly illustrated in *Puckrein v. ATI Transport, Inc.*, 186 *N.J.* 563, 897 *A.2d* 1034 (2006). In that case, a waste disposal company hired an independent-contractor trucker to haul glass residue and solid waste over the highways. *Id.* at 570, 897 *A.2d* 1034. Because of the negligent maintenance and operation of the truck, a horrific roadway accident occurred, killing and maiming several people. *Id.* at 568, 897 *A.2d* 1034. The truck had no insurance identification card and an expired registration, and therefore the trucker had no right to be on the road. *Id.* at 569, 897 *A.2d* 1034. In short, the trucker was "incompetent" to haul the company's waste.

We held that "a company whose core purpose is the collection and transportation of materials on the highways, has a duty to use reasonable care in the hiring of an independent trucker[,] including a duty to make an inquiry into that trucker's ability to travel legally on the highways." *Id.* at 579–80, 897 *A.2d* 1034. After hiring the trucker, the company had a continuing duty to make a reasonable inquiry into whether the trucker had liability insurance and a valid registration—the essential qualifications to be on the road. *Id.* at 580–81, 897 *A.2d* 1034. We concluded that if the

company knew or should have known of the trucker's incompetence, the company then would be vicariously liable for the trucker's negligence. *Id.* at 580, 897 *A.*2d 1034.

Likewise, as of March 19, 1998, the effective date of the statute requiring physicians to carry medical malpractice insurance, Dr. Wolf was an incompetent contractor who no longer possessed an essential qualification to practice medicine. Although Dr. Wolf first saw Basil in January 1998, before the statute's start date, he continued to treat Basil through February 1999. As in *Puckrein,* the carrier here had a continuing duty to inquire whether the physicians it retained to furnish treatment or to conduct independent medical examinations of injured workers maintained statutorily-mandated malpractice insurance in accordance with *N.J.S.A.* 45:9–19.17. That statute provided:

*A physician who maintains a professional medical practice in this State and has responsibility for patient care is required to be covered by medical malpractice liability insurance,* or if such liability coverage is not available, by a letter of credit for the minimum amount required by the State Board of Medical Examiners. [*N.J.S.A.* 45:9–19.17(a) (emphasis added).] [2]

The statute was enacted on January 19, 1998 and went into effect on March 19, 1998. *See L.* 1997, *c.* 365, § 3. It mandated that the State Board of Medical Examiners notify all licensed physicians of the statute's requirements within thirty days of the date of the statute's enactment—by February 18, 1998. *N.J.S.A.* 45:9–19.17(d). Accordingly, on March 19, 1998, Dr. Wolf and all other licensed physicians in New Jersey were required to have medical malpractice insurance. By April 9, 1998, Dr. Wolf was required to advise the Board of Medical Examiners that he had acquired medical malpractice insurance. *N.J.S.A.* 45:9–19.7.[3]

---

[2] *N.J.S.A.* 45:9–19.17(b) states that "[a] physician who is in violation of this section is subject to disciplinary action and civil penalties.. ." Presumably, the State Board of Medical Examiners would not permit a physician, who refused to comply with the statute by procuring malpractice insurance, to practice medicine.

[3] *N.J.S.A.* 45:9–19.7 requires all physicians to provide certain information in their biennial applications for relicensing, such as the name and address of their

The majority concedes that a physician who conducts an independent medical examination "maintains a professional medical practice" for purposes of *N.J.S.A.* 45:9–19.17 and therefore is required to carry malpractice insurance. On the other hand, the majority, astonishingly, claims that *N.J.S.A.* 45:9–19.17 did not become effective on March 19, 1998, as decreed by the Legislature, *see L.* 1997, *c.* 365, § 3, but rather on April 5, 1999, when the State Board of Medical Examiners promulgated regulations defining certain terms of the statute, *see* 31 *N.J.R.* 881(a) (Apr. 5, 1999) (codified at *N.J.A.C.* 13:35–6.18). There is no support for that claim in the legislation. The Legislature did not cede to the State Board of Medical Examiners, an executive branch agency, the power to undo the effective date of the statute.

Moreover, nothing in *N.J.S.A.* 45:9–19.17 indicates the need for the promulgation of regulations to trigger the statute's insurance coverage requirement or for the Medical Board to define the statute's terms. The majority, nonetheless, suggests that before the Board's adoption of its regulations, the statutory words, "maintains a professional medical practice in this State," essentially had no meaning. I disagree. Had the Medical Board never promulgated a regulation, we would give those words their plain meaning, and if those words were susceptible to ambiguity, we would then attempt to divine the Legislature's intent through other traditional methods of statutory interpretation. *See DiProspero v. Penn,* 183 *N.J.* 477, 492–93, 874 *A.*2d 1039 (2005). The suggestion that *N.J.S.A.* 45:9–19.17 was a nullity until the Board promulgated a regulation has no basis in the statute itself or our law in general. *See Smith v. Dir., Div. of Taxation,* 108 *N.J.* 19, 26, 527 *A.*2d 843 (1987) (noting that "administrative regulations are not binding on the courts and a regulation will fall if a court finds that the rule is inconsistent with the statute it purports to interpret"); *Kingsley v. Hawthorne Fabrics, Inc.,* 41

medical malpractice insurers. Physicians are also required to inform the Board of Medical Examiners of any change to that information within twenty-one days. *Ibid.*

*N.J.* 521, 528, 197 *A.*2d 673 (1964) ("An administrative agency may not ... give [a] statute any greater effect than its language allows.").

B.

Another exception to the rule that a principal will not be held liable for the negligence of an independent contractor is when the principal exercises or retains control over the contractor's performance. *Majestic Realty, supra,* 30 *N.J.* at 431, 153 *A.*2d 321. Generally, a principal "who hires an independent contractor 'has no right of control over the manner in which the work is to be done,' " and therefore is not vicariously liable for the contractor's negligence. *Baldasarre, supra,* 132 *N.J.* at 291, 625 *A.*2d 458 (quoting W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 71 (5th ed. 1984)). However, when a principal directs or exercises control over the very manner in which the contractor performs his work, the principal loses any immunity from liability for the contractor's negligence. *See Mavrikidis, supra,* 153 *N.J.* at 134–35, 707 *A.*2d 977 (noting that "the reservation of control of the manner and means of the contracted work by the principal permits the imposition of vicarious liability" (quotation omitted)). Although a principal may exercise broad supervisory power to ensure that the independent contractor is carrying out his responsibilities, the principal may not direct the means by which the contractor fulfils those responsibilities and still argue that it is not vicariously liable for the contractor's negligence. *See Majestic Realty, supra,* 30 *N.J.* at 431, 153 *A.*2d 321.

Here, viewing the evidence in the light most favorable to plaintiff, Transportation Insurance Company not only exercised control over the means by which Dr. Wolf discharged his medical duties, but Dr. Wolf surrendered his independent medical judgment to the authority of the carrier. The extent of the carrier's involvement in the treatment of Basil permits the inference that the carrier itself was practicing medicine. As noted earlier, Dr. Wolf sent the physical therapy prescription to the carrier. In-

stead of seeking approval from the carrier for the diagnostic tests that were necessary, Dr. Wolf consulted with the carrier as though he were seeking its input for medical decisions that fell within his exclusive province. So, for example, Dr. Wolf suggested that a chest x-ray "would be the logical first step"—he did not seek authorization for one. Consequently, months of foot-dragging passed before so simple but critical a test was performed. Additionally, instead of asking the carrier to authorize a medically-necessary MRI after discovery of a golf-ball-sized growth in Basil's chest, Dr. Wolf obligingly asked the carrier to "consider[ ]" an MRI. The carrier's own imprudent micromanagement of and control over Basil's medical care does not permit it to hide behind the immunity shield that ordinarily would protect a principal from the negligent acts of its independent contractor.

In light of the most favorable evidence and inferences supporting plaintiff's case, the majority erred in affirming the dismissal of the claims of Basil's widow.

## IV.

In summary, Mrs. Basil's case should proceed to a jury, which has the responsibility for deciding contested facts. At this stage, Mrs. Basil has presented sufficient evidence, if believed by a jury, to hold Transportation Insurance Company vicariously liable for the death of her husband. Dr. Wolf's failure to carry malpractice insurance made him an incompetent contractor, and the carrier had a continuing duty to inquire whether Dr. Wolf maintained medical malpractice insurance as required by *N.J.S.A.* 45:9–19.17. Moreover, the carrier controlled and directed the very manner in which Dr. Wolf provided medical services to Basil.

I concur with the majority that Mrs. Basil was not barred by the Workers Compensation Act from bringing a direct action against Dr. Wolf. For the reasons expressed, however, I would reverse the Appellate Division and reinstate Mrs. Basil's claims against the carrier for the death of her husband. I therefore respectfully concur in part and dissent in part.

*For affirmance*—Justices LaVECCHIA, WALLACE, RIVERA–SOTO and HOENS—4.

*Concurring in part; dissenting in part*—Justice ALBIN—1.